**CATERPILLAR TRACTOR COMPANY,**
a California Corporation

v.

**The UNITED STATES.**

No. 212–76.

United States Court of Claims.

Dec. 13, 1978.

Warren C. Seieroe, Chicago, Ill., for plaintiff. Emory S. Naylor, Jr., Chicago, Ill., atty. of record. Clinton A. Krislov, McDermott, Will & Emery, Chicago, Ill., of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

BENNETT, Judge, delivered the opinion of the court:

The plaintiff, Caterpillar Tractor Company (Caterpillar), seeks to recover overpayments of federal income taxes and interest for the taxable year ending December 31, 1972. The case concerns the propriety of deductions for sales commissions paid to plaintiff's wholly owned subsidiary, Caterpillar Panamerican Company (CATPAC). Allowance of these deductions depends on whether CATPAC qualifies as a Domestic International Sales Corporation (DISC) under I.R.C. §§ 991–997. We think it does. This case is before the court on the parties' stipulations of facts.

Caterpillar is a domestic corporation which is the parent of an international

manufacturing and sales organization, the primary products and activities of which are industrial equipment and earth moving. For its business in and exports to the Western Hemisphere,[1] Caterpillar uses two wholly owned subsidiaries, Caterpillar Americas Company and Caterpillar Mexicana, S.A. de C.V., which are both qualified for a special tax rate reduction as Western Hemisphere Trade Corporations (WHTC) under I.R.C. §§ 921–922.

In 1971, Congress added to the Internal Revenue Code I.R.C. §§ 991–997 to provide special tax treatment through the use of a vehicle to be known as a DISC for the exportation of American products to foreign countries, effective for tax years beginning with January 1, 1972. In order to take advantage of this legislation, Caterpillar set up two corporations: CATPAC to serve as a commission agent DISC solely with respect to plaintiff's sales of products to its two WHTCs, and Caterpillar Export Company to serve as a commission agent DISC with respect to all other Caterpillar export sales.

In essence, the transactions at issue worked as follows: Caterpillar sold the products it manufactured for export to foreign countries in the Western Hemisphere to Caterpillar Americas and Caterpillar Mexicana, Caterpillar's two WHTCs, in arm's-length transactions. The income Caterpillar received from these sales, it shared with CATPAC under the special allocation rules for DISCs under I.R.C. § 994. The two WHTCs exported the products and sold them in foreign markets. Thus, Caterpillar Mexicana and Caterpillar Americas received

tax savings provided by I.R.C. §§ 921–922 on the income attributable to the foreign sales of the products, while CATPAC (and indirectly Caterpillar, since a DISC is not a taxable entity) received the tax savings provided by I.R.C. §§ 992–997 on the income derived basically from the manufacture of the product.

According to this arrangement, Caterpillar assigned commissions to CATPAC, which commissions aggregated $8,730,493.92 for its taxable year 1972 and claimed a deduction therefor on its 1972 return. On audit, these deductions were disallowed (except for $209.98 which represented commissions in an amount equal to the amortized organization expense of CATPAC). Relying on Treas.Reg. § 1.993–3(a)(5) (1977),[2] the Government argues that CATPAC did not qualify as a DISC, for all of its export property was sold to a related WHTC. This conclusion was based on the Treasury's interpretation contained in the regulation that export property within the meaning of I.R.C. § 993(e) does not include property sold to a related WHTC. Assuming this interpretation is correct, then the sales in question were not qualified export receipts under I.R.C. § 993(a), and CATPAC did not meet one of the conditions of being a DISC, in that 95 percent of its gross receipts were qualified export receipts under I.R.C. § 992(a)(1)(A). Therefore, Caterpillar's deductions were improper.[3] After due consideration, we hold that property sold to a related WHTC is "export property" within the meaning of I.R.C. § 993(c) and that plaintiff is entitled to recover.

---

1. For the purposes of this opinion, Western Hemisphere is used as that term is defined in I.R.C. § 921.

2. The regulation defines export property as property "[w]hich is not sold or leased by any person to a Western Hemisphere trade corporation (as defined in section 921) which is a related person (as defined in § 1.993–1(a)(6)) with respect to the seller, lessor, or commission agent (if any) * * *."

3. The result, that denial of the DISC status to a corporation results in the disallowance of a "commission" expense to the parent, may appear confusing at this point. One of the objec-

tives of the DISC provisions is to permit the splitting of income under rules set out in the statute between parent and DISC without regard to the propriety of this device under I.R.C. § 482 or assignment of income principles. Thus, a DISC, without providing any services, can "earn" income. *See* Treas.Reg. § 1.994–1(a)(2) (1975). This is what happened in this case. If the corporation does not qualify as a DISC, this exception to the assignment of income rule does not apply and the income is reallocated on the basis of which entity actually earned the income.

## I

As noted above, Treas.Reg. § 1.993(a)(5) (1977) denies the benefit of the DISC provisions to this taxpayer. Caterpillar argues, however, that the regulation is an invalid interpretation of the statute because it denies a benefit to Caterpillar which the statute clearly allowed. Alternatively, Caterpillar contends that the regulation, even if it presents a valid interpretation, cannot be retroactively applied to the taxable year in dispute, 1972. Since we believe that it is less interference with administrative authority to determine that a regulation does not apply to a particular taxpayer than to determine that a regulation is void, we feel compelled to state our reasons as to why the regulation would apply to this taxpayer if it were found to be valid.

The DISC provisions were made effective by statute for tax years beginning on or after January 1, 1972. On January 24, 1972, the Department of the Treasury Published DISC: A *Handbook for Exporters (Handbook)* under the signature of the Secretary of the Treasury as a guide to the new legislation. On October 4, 1972, the IRS published proposed regulation § 1.993–3(a)(4)(ii), 37 Fed.Reg. 20853, 20860 (1972),[4] which denied DISC benefits on sales to a related WHTC. Plaintiff's petition was filed in this court on June 1, 1976. On October 14, 1977, Treas.Reg. § 1.993(a)(5) (1977), which contained the proposed regulation's prohibition, was adopted.

■ It is plaintiff's contention that the *Handbook* is the only relevant authority for the tax year 1972 and binds the defendant. The *Handbook* states in the general question and answer section that a DISC could sell to "any related or unrelated person where the property is to be delivered outside the United States for use outside the United States." *Handbook* at 6. It is hornbook law that informal publications all the way up to revenue rulings are simply guides to taxpayers, and a taxpayer relies on them

at his peril. *See, e. g., Carpenter v. United States,* 495 F.2d 175 (5th Cir. 1974); *Adler v. Commissioner,* 330 F.2d 91 (9th Cir. 1964). Plaintiff contends, however, that the Secretary guaranteed that the rules and procedures set forth in the *Handbook* would be followed by the Treasury until "prospectively" modified by regulations or other publications. *Handbook* at 10. This provision, however, only applies by its own terms to Part III of the *Handbook* which does not contain the question and answer relied upon by plaintiff. On examining Part III, there is no statement on this subject; thus, we are not required to reach the question of what effect, if any, such a guarantee might have on the defendant's position.

■ Interpretive regulations are not law, they are simply the interpretation of statutes previously enacted. Treasury regulations are normally retroactive and the Secretary has the power to prescribe when a regulation shall be applied without retroactive effect. I.R.C. § 7805(b). Although not all regulations can be applied retroactively, the first regulation promulgated under a statute, as in this case, is properly applied retroactively. *See Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). This is because an interpretive regulation is not authority independent of the statute, but is an interpretation of the statute, which, if reasonable, is accepted or deferred to by the courts because it was made by the agency Congress has entrusted with carrying out its purpose.

■ There is an exception to this rule, as plaintiff points out, that the regulation is invalid as to the taxpayer if the Treasury has abused its discretion. It may be an abuse of discretion to adopt a regulation with the purpose of aiding pending litigation. *See Chock Full O'Nuts Corp. v. United States,* 453 F.2d 300, 303 (2d Cir. 1971). Since in this case this Treasury position was evident as early as 1972 in the proposed

---

4. The proposed regulation defined export property as that property "[w]hich is not sold or leased * * * by any person to a Western Hemisphere trade corporation (as defined in

section 921) which is a related person (as defined in § 1.993–1(a)(6)) with respect to the seller, lessor, or commission agent (if any)."

regulation, we do not believe that the adoption of the regulation was such an abuse of discretion.

## II

■ It is desirable, before examining the express language of I.R.C. § 993(c) in particular, to review briefly and compare the two incentive provisions. The provisions of the Code at issue here are as complicated as most provisions in the foreign tax area. There is scant legislative history on the WHTC provisions but it is clear that the purpose of the legislation was to ameliorate somewhat the unfavorable situation in which domestic corporations had to compete with foreign corporations in the Western Hemisphere. S.Rep.No.1677th Cong., 2d Sess. 32 (1942). This included competition from U.S.-owned foreign corporations.

■ The major purpose of the DISC provisions was to encourage the worldwide exportation of American-made products in order to alleviate the growing deficit in the United States balance of payments. The Senate Finance Committee also concluded tha an important reason for the provisions was to remove a current disadvantage of domestic corporations from both foreign corporate and U.S.-owned foreign corporate competition. S.Rep.No.92–437, 92d Cong., 1st Sess. 90 (1971), *reprinted in* [1971] U.S. Code Cong. & Admin.News, pp. 1825, 1996. The two provisions have some different and some shared goals. The manner in which their objectives are carried out, however, is markedly different.

A comparative examination of the mechanics and scope of the two provisions illustrates this. Both provisions contemplate separate corporate entities designed to conform precisely with the statutory mandate. The WHTC provisions only affect businesses which operate in the Western Hemisphere, whereas DISCs can operate world-wide. WHTCs can engage in commerce either with products or services; DISCs are limited to the sale of American products, the lease of those products, or services related to the sale or lease of those products. A WHTC's product does not have to originate in the United States while products which a DISC sells must originate in the United States. Ninety-five percent of the income of a WHTC must be derived from sources outside the United States; no such requirement is imposed on a DISC, the only requirement being that the product eventually is exported from the United States for use outside the United States.

What makes the WHTC and the DISC so different is the tax treatment of the two entities. The WHTC's transactions with affiliate corporations are governed by "arm's-length" pricing policies under I.R.C. § 482 and general assignment of income doctrine. DISCs, on the other hand, have the option of allocating profits between them and affiliated corporations on the basis of the most favorable of three methods: (1) an "arm's-length" transaction, (2) 50 percent of the total manufacture and sales profit from an export product, or (3) 4 percent of the gross receipts (which includes those from both the manufacture and sale of the product). Thus, while a WHTC must derive at least 90 percent of its gross income from the active conduct of a trade or business, and this income must be actually earned by it and not by an affiliated corporation, a DISC is permitted to be no more than a shell corporation with no employees, the only purpose of which is to act as an accounting vehicle for the earnings of its affiliated or parent corporation. A DISC is a nontaxable entity which is designed to permit the deferral of a portion of an enterprise's profits from the exportation of products, as long as the DISC is in existence. A WHTC is an operational taxable entity which receives a special deduction which effectively operates as a reduction of the corporate tax rate on its earnings. Certainly, after a general look at the statutory provisions, there is no indication that both tax incentives are not available for use on different segments of a controlled group's income.

## III

Turning to our specific problem of whether the sales in question were export proper-

ty within the meaning of the DISC provisions, it is defendant's contention that the statute, as properly interpreted by Treas. Reg. § 1.993(a)(5) (1977), excludes such sales from its definition of export property.

As a general matter, the regulations of an administrative agency charged with the duty to carry out a congressional mandate are entitled to great weight. Treasury regulations are invalid, however, if they are out of harmony with the intent of the statute, or they contradict the express terms of the statute. To be valid, they must be consistent with the statute and be reasonable. *Manhattan Gen. Equip. Co. v. Commissioner, supra.* Often, in speaking of the interpretive regulation-making power of the Treasury, as opposed to the legislative rule-making power of the Treasury, courts speak of the sole purpose of an interpretive regulation as being to reconcile ambiguities in the statute with reasoned interpretation. If the statute is unambiguous on its face, there is no room for Treasury interpretation. *See Koshland v. Helvering,* 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268 (1936); *Hart v. United States,* Ct.Cl. No. 74–77 (Oct. 18, 1978); *Louisville Gas & Elec. Co. v. United States,* 148 Ct.Cl. 671 (1960); *Mead Corp. v. Commissioner,* 116 F.2d 187 (3d Cir. 1940). All courts recognize the principle, however, that the Treasury has no power to supply an omission or create an exception not already in the statute. *Commissioner v. Acker,* 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); *United States v. Calamaro,* 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957); *Helvering v. Credit Alliance Corp.,* 316 U.S. 107, 62 S.Ct. 989, 86 L.Ed. 1307 (1942); *Louisville Gas & Elec. Co. v. United States, supra.*

Plaintiff fits solidly within the literal language of the statute. As pointed out above, resolution of plaintiff's claim depends entirely upon the construction of the term "export property" in I.R.C. § 993(c). That section has three parts: (c)(1) which sets out three essential attributes the property must have to qualify, (c)(2) which sets out four attributes which will disqualify property otherwise qualified, and (c)(3)

which sets out a category of property which may be disqualified as a result of Executive order. The property at issue in this case admittedly possessed each of the three attributes of section 993(c)(1), none of the four attributes of section 993(c)(2), and was not a category of property covered by any Executive order.

Defendant responds, however, that, if one examines the statute as a whole and compares it with the WHTC provisions, plaintiff's attempt to include the sale of products from a DISC to a related WHTC contradicts the intent of the statute. Defendant submits several arguments in support of this contention.

Defendant's primary argument is that the DISC provisions were designed solely to act upon the sales component of the income derived from the exportation of U.S.-made products. Thus, plaintiff, by allocating a portion of the income it derived solely from manufacturing operations to its DISC, contravened the basic tenet of the statute. While we see some validity in defendant's understanding of the workings of the statute, Congress did not impose any *requirement* to this effect. While a DISC cannot be a manufacturer itself [I.R.C. § 993(c)(1)], it is not actually required to provide sales services. Nor does a business enterprise which uses a DISC actually have to be involved in foreign sales. The only requirement in this respect is that property sold to a DISC is "for direct use, consumption, or disposition outside the United States * *." I.R.C. § 993(c)(1)(B). Indeed, the Treasury's own publications conclude that a domestic manufacturer, uninvolved in export sales except insofar as its product, without modification, is exported, can avail itself of the benefit of the DISC provisions. *See* Rev.Rul. 74–551, 1974–2 C.B. 238. Further, Congress permitted a DISC to own and make use of a Foreign International Sales Corporation (FISC) to handle all selling functions. *See* I.R.C. §§ 993(a)(1)(E), 993(e)(1). The regulation itself only prohibits DISC treatment to a manufacturer which sells to a related WHTC, but not a manufacturer which sells its products to unrelated WHTCs.

Further, the rules for intercompany pricing [I.R.C. § 994] independently point out the error of accepting defendant's interpretation as a fundamental premise of the statute. The taxpayer is permitted to use the most beneficial of three methods of allocating profits. Section 994(a)(3) requires arm's-length pricing which effectively provides that only the sales component of the enterprise's income is subject to DISC treatment. Section 994(a)(2) provides for 50 percent of the total enterprise's profit to be allocated to the DISC. This provides for both the situation where the DISC actually provides no services and where the selling component of the income is *less* than 50 percent of the total enterprise's profit. Section 994(a)(1) provides for 4 percent (plus incidental items) of the total enterprise's gross receipts, to be allocated to the DISC, thus permitting an amount up to the enterprise's total profits (both manufacture and sale) from export property to be subject to the DISC provisions. Thus, we can only conclude that Congress saw fit to increase exports by granting tax advantages either to the selling component, the manufacturing component, or both.

Defendant stresses that to allow the tax treatment plaintiff claims would result in a double benefit on income from one transaction. It is inconceivable, defendant contends, that Congress intended that two incentive programs with such similar objectives would act independently on the same income. Further, the subject transaction has the same effect as two types of transactions which were specifically excepted from the benefits of the statutes. Moreover, the sale by a DISC to a related WHTC results in a larger tax savings than either of the exempted transactions. This demonstrates that Congress did not intend these provisions to be used in tandem.

5. It might be instructive to remark at this point that the use of the WHTC corporate form is neither widespread nor does it result in a significant loss of revenue to the United States. In repealing the WHTC provisions in 1976, Act of Oct. 4, 1976, Pub.L. No. 94–455, Title X, § 1052(a), (c)(1), 90 Stat. 1647, 1648, Congress provided for a general phaseout of the WHTC benefits over a 4-year period. *See* I.R.C. § 922(b). The provision, providing basically for

Were all of defendant's contentions supported, we might have cause to ponder indeed. Close examination of the relevant provisions, however, demonstrates the fallacy of defendant's argument.

We must admit at first that plaintiff's ability to use both provisions does result in a larger tax savings on the entire transaction than would either provision used alone. This merely demonstrates, however, that there is something truly at stake in this controversy.[5]

A comparison of plaintiff's situation with the two situations specifically excluded by Congress is particularly important here. The first, found in I.R.C. § 993(a)(2), provides:

> For purposes of this part, the term "qualified export receipts" does not include receipts from a corporation which is a DISC for its taxable year in which the receipts arise and which is a member of a controlled group (as defined in paragraph (3)) which includes the recipient corporation.

Thus, a DISC cannot sell to a related DISC and receive the benefits of the statute. Without such provision, income could proceed through two deferrals, resulting in a larger total deferral. Congress prevented herein a double deferral on the same income.

Congress provided the second prohibition by amendment to the WHTC provisions. I.R.C. § 922(a) provides:

> No deduction shall be allowed under this section to a corporation for a taxable year for which it is a DISC or in which it owns at any time stock in a DISC or former DISC (as defined in section 992(a)).

a reduction in the corporate tax rate from the previously allowed 14 percent to 11 percent in 1976, 8 percent in 1977, 5 percent in 1978, and 2 percent in 1979, was estimated to save total revenues of 10, 20, 30, 40, and 50 million dollars in 1976, 1977, 1978, 1979, and 1980, respectively. *See* H.R.Rep. No. 94–658, 94th Cong., 2d Sess. 21 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 2897, 2916.

Thus, a corporation which is or which owns stock in a DISC is not eligible for the tax rate reduction available to WHTCs. The parties have given several examples of transactions covered by this prohibition, including the sale from a parent WHTC to a subsidiary DISC or the sale from a parent domestic manufacturing corporation to a subsidiary WHTC using a WHTC's subsidiary DISC as a commission agent of the domestic manufacturing corporation. The former example would have permitted both deferral of income at the DISC level and that same income's ultimate tax at the lower WHTC rates.[6] The latter example would have included, in addition to the tax treatment of the former, the shifting of income from the higher bracket domestic manufacturer to the lower bracket WHTC.

The common feature of both exclusions is the prohibition of two benefits (two DISCs or a DISC and a WHTC) on the same income.[7] The amendment to the WHTC provisions also has the collateral effect of preventing the circumvention of the arm's-length pricing rules covering transactions between corporations and their related WHTCs. Plaintiff's situation does not run afoul of any of these objectives, for there is neither a double deferral applied to the *same* income, nor both a deferral and a lower rate on the *same* income, nor the latter coupled with income shifting between the domestic manufacturing corporation and the lower bracket WHTC. Instead, plaintiff has divided its operations into two segments: a domestic manufacturing operation and a foreign sales component. The two incentives act solely and without overlap on separate sections of the controlled group's income, the DISC incentive on the

manufacturing component and the WHTC incentive on the sales component.

Without doubt, the plaintiff's ability to take advantage of both provisions in this case results in a larger tax savings to the controlled group than the use of either of the forbidden transactions. But differing tax treatment alone is insufficient to invalidate plaintiff's claimed treatment. This is not a case where the form of a transaction simply covers up the reality which Congress has prohibited.

Indeed, the amendment of section 922 convinces us that Congress was aware of the interplay between DISCs and WHTCs. It did foreclose certain conjunctive uses of the provisions which would have been an anathema to its purpose. Though we do not accept as a cardinal principle, as plaintiff asserts, that the fact Congress did close certain loopholes means Congress intended that all other loopholes be fully operative, the consideration by Congress of the relationship of the very statutes in question raises an inference that other conjunctive uses of these statutes were intended. But, we do not have to so conclude. Congress, having specifically shut the door on some conjunctive uses of the statutes but not specifically on the one at issue, leads irresistibly to the conclusion that Congress did not except property sold by a DISC to a related WHTC from its definition of "export property." Whether this was done by design or through inadvertence is immaterial herein. Neither the Treasury nor this court can legislate such an exception.[8]

■ In view of all the circumstances, we hold that defendant's interpretation of the

---

**6.** Indeed, this is the specific rationale of the amendment. The committee reports provide: "It would be inappropriate to accord tax-deferred status to a DISC's profits when earned by the DISC and, in addition, the special Western Hemisphere trade corporation tax rates on those profits when they are distributed by the DISC." *See* S.Rep. No. 92–437, 92d Cong., 1st Sess. 125 (1971), *reprinted in* [1971] U.S.Code Cong. & Admin.News, pp. 1918, 2031; H.Rep. No. 92–533, 92d Cong., 1st Sess. 91 (1971), *reprinted in* [1971] U.S.Code Cong. & Admin. News, pp. 1825, 1904.

**7.** Surprisingly, defendant appears to recognize this in respect to the WHTC amendment in Rev.Rul. 76–537, 1976–2 C.B. 228. There it was stated: "The Congressional committee reports and regulations relate to the possible double benefit to a WHTC; rather than to its owner."

**8.** In fact, Congress has acted and has repealed the WHTC provisions with a 4-year phaseout which has terminated this loophole in the future. *See* note 5 *supra*.

**1048**

statute is incorrect and that the regulation as to this point, being contrary to the plain language of the statute, cannot stand. Accordingly, judgment is entered for plaintiff, and the case is remanded to the trial division for proceedings under Rule 131(c) to determine the amount of recovery.