## THOMAS INTERNATIONAL LIMITED

v.

## The UNITED STATES.

No. 449–81T.

United States Claims Court.

Oct. 12, 1984.

Michael D. Gunter, Winston-Salem, N.C., for plaintiff. Thomas L. Kummer, Alice M. Pettey and Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., of counsel.

Mary M. Abate, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser, Jr., Washington, D.C., of counsel.

## OPINION

### ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

This suit is for refund of corporate income taxes paid for the years 1977 and 1978.

Internal Revenue Code (I.R.C.) §§ 991–97 provides for deferred tax treatment of income from foreign sales conducted through an intermediary corporation known as a Domestic International Sales Corporation, or DISC. I.R.C. § 992(a) provides, *inter alia,* that for a corporation to be a DISC it must own qualified export assets, the adjusted basis of which at the close of its taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all of its assets; and § 993(b) provides that qualified export assets include accounts receivable. The question at issue is whether or not the Treasury is authorized to provide by regulation that an account receivable representing accrued commissions payable to the DISC by its related supplier in connection with the sale of export property is includible in qualified export assets only if such commissions are paid no later than 60 days after the close of the taxable year.

*Facts*

Plaintiff, Thomas International Limited (hereinafter TIL), is a wholly owned corporate subsidiary of Thomas Built Buses (hereinafter TBB). TBB is engaged in the business of manufacturing and selling buses. TIL was organized by TBB in 1973 to qualify as a DISC, and TIL elected such treatment from and after its first taxable year. During the taxable years at issue, TIL engaged exclusively in export related activities.

On July 1, 1973, TIL and TBB executed a written supplier's agreement whereby TIL would serve as a "commission DISC" in conformity with the Internal Revenue Code and Treasury Regulations. As a commission DISC, plaintiff accrued a commission from TBB on all export sales made by TBB. The amount of the commission was determined under the "50–50 combined taxable income method" (described in § 994(a)(2), discussed *infra*).

For the taxable years ending March 31, 1977 and 1978, TBB reported sales of export property yielding taxable income of $1,416,462 and $658,114, respectively. TIL accumulated entitlement to gross commissions with respect to these export sales, of

$708,231 in 1977, and $329,057 in 1978. These commissions were properly accrued as accounts receivable in the books of TIL on March 31, 1977 and 1978, respectively. However, TBB did not actually pay such commissions to TIL until December 15, 1977, and June 1, 1978, respectively.

Plaintiff reported on its federal income tax returns DISC taxable income of $665,-737 for its taxable year ended March 31, 1977, and $307,640 for its taxable year ended March 31, 1978. However, because of its claim to qualification as a DISC, it paid no taxes for either year.

On January 9, 1981, the Internal Revenue Service (I.R.S.) issued notices of deficiencies to TIL stating its determination that TIL did not qualify as a DISC for the taxable years ending in 1977 and 1978, because, at the end of these taxable years, the adjusted basis of the qualified export assets owned by TIL did not equal or exceed 95 percent of the sum of the adjusted basis of all assets held by TIL, as required by § 992(a)(1)(B). The reason underlying the determination was that the commissions receivable by plaintiff from TBB for 1977 were not paid to it until 8½ months after the close of that taxable year and for 1978 until 62 days after the close of that year.

Plaintiff paid the assessed deficiency and filed claims for refund. On April 3, 1981, the I.R.S. disallowed TIL's claims and plaintiff timely filed this suit on July 20, 1981.

*The General DISC Statutory Scheme*

The DISC provisions, I.R.C. §§ 991–97, were originally added to the Code by the Revenue Act of 1971 (Pub.L. No. 92–178, Title V, § 501, 85 Stat. 535). The purpose of the legislation was explained as follows:

[I]t is important to provide tax incentives for U.S. firms to increase their exports. This is important not only because of its stimulative effect but also to remove a present disadvantage of U.S. companies engaged in export activities through

domestic corporations. Presently, they are treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations. United States corporations engaging in export activities are taxed currently on their foreign earnings at the full U.S. corporate income tax rate regardless of whether these earnings are kept abroad or repatriated. In contrast, U.S. corporations which produce and sell abroad through foreign subsidiaries generally can postpone payment of U.S. tax on these foreign earnings so long as they are kept abroad.

In addition, other major trading nations encourage foreign trade by domestic producers in one form or another. * * Both to provide an inducement for increasing exports and as a means of removing discrimination against those who export through U.S. corporations, your committee's bill provides a deferral of tax where corporations meeting certain conditions—called Domestic International Sales Corporations—are used.

(H.R.Rep. No. 533, 92d Cong., 1st Sess. 58 (1971), *reprinted in* 1972–1 C.B. 498, 529; and *see also* S.Rep. No. 437, 92d Cong., 1st Sess. 90 (1971), *reprinted in* 1972–1 C.B. 559, 609, U.S.Code Cong. & Admin.News 1971, pp. 1825, 1872, 1996.)

In general, the profits of a DISC are not taxed to the DISC, but, prior to enactment of the Deficit Reduction Act of 1984[1] were to be taxed to its corporate shareholder when distributed or deemed distributed. I.R.C. § 991. The DISC is not required to have any employees or payroll. Its orders may be solicited by the parent corporation's sales force, in the parent's name, and collections may also be handled directly by the parent. The parent may impute to the DISC either the proceeds of the export sales or commissions on such sales. I.R.C. § 994(b)(1); Treas.Reg. § 1.993–1(1) (1977). As the court stated in *Caterpillar Tractor*

---

1. Act of July 18, 1984, § 805(b)(2)(A), Pub.L. No. 98–369, 98 Stat. 494, 1001 (to be codified at    26 U.S.C. § 991 note).

*Co. v. United States,* 218 Ct.Cl. 517, 525–26, 589 F.2d 1040, 1044 (1978):

> a DISC is permitted to be no more than a shell corporation with no employees, the only purpose of which is to act as an accounting vehicle for the earnings of its affiliated or parent corporation * * * which is designed to permit the deferral of a portion of an enterprise's profits from the exportation of products as long as the DISC is in existence.

I.R.C. § 992 prescribes the statutory qualifications for a DISC, included among which are that 95 percent or more of the DISC's gross receipts must consist of qualified export receipts, and that at the close of its taxable year the adjusted basis of the corporation's qualified export assets must equal or exceed 95 percent of the adjusted basis of all of its assets.

I.R.C. § 993 provides the definitions for qualified export receipts and qualified export assets. Insofar as pertinent, qualified export receipts are those from the sale of export propoerty and for services related and subsidiary to any qualified export property for ultimate use outside the United States. I.R.C. § 993(a). Likewise, insofar as pertinent, qualified export assets refers generally to property produced in the United States for sale or rental in the ordinary course of business outside the United States. I.R.C. § 993(b). In the case of commissions on the sale of property, the amount taken into account as gross receipts are the gross receipts on the sale or rental of the property on which the commissions arose. I.R.C. § 993(f).

I.R.C. § 994, entitled "Inter-company Pricing Rules", prescribes the standard for the allocation of income between the related corporations. Under § 994(a) the taxable income of the DISC is to be based on a transfer price from the shareholder-supplier which would allow the DISC to derive income from the sale of the property in an amount which does not exceed the greater of: (1) 4 percent of the qualified export receipts on the sale of the property by the DISC plus 10 percent of the export promotional expenses attributable to the DISC;

(2) 50 percent of the combined taxable income of the DISC and the supplier plus 10 percent of the DISC's attributable export promotional expenses; or (3) income based upon the sale price actually charged by the supplier to the DISC (but subject to adjustment pursuant to § 482).

I.R.C. § 994(b) also directs the Secretary of the Treasury to prescribe regulations setting forth "rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals and other income." Pursuant to this authority, in Treas.Reg. § 1.994–1(d)(2), the Secretary has prescribed that if any transaction to which I.R.C. § 994 applies is handled on a commission basis for a related supplier by a DISC and such commissions give rise to qualified export receipts, the amount of the income which may be allocated as earned by the DISC is the amount which under § 994(a) the DISC would have been permitted to earn if the related supplier had sold the property to the DISC and the DISC in turn had sold it to a third party.

I.R.C. § 995, which deals with "Taxation of DISC Income to Shareholders", prescribes the portion of the DISC income which is initially taxable to its shareholders each year and the applicable conditions and times when the remainder of the DISC income becomes taxable to them either because it is actually distributed or it is deemed distributed whether or not it is actually done.

*Discussion*

Pursuant to the regulatory authority set forth in § 994(b), Treas.Reg. § 1.994–1 implements the provisions of I.R.C. § 994 for allocating income between DISC and related supplier as follows:

§ 994. *Inter-company pricing rules*

\* \* \* \* \* \*

(e) Method of applying paragraphs (c) [Transfer price for sale of export property] and (d) [Rules under section 994(a)(1) and (2) for transactions other than sales] of this section—

\* \* \* \* \* \*

(3) Initial payment of transfer price or commission. (i) The amount of a transfer price (or reasonable estimate thereof) actually charged by a related supplier to a DISC, or a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transactions occurred.

Although neither I.R.C. § 992(a)(1) (which requires that the adjusted basis of the qualified export assets at the close of the year equal or exceed 95 percent of the total asset basis) nor § 993(b) (which defines "qualified export assets" to include, *inter alia,* "accounts receivable * * * which arise by reason of transactions of such corporation") contains authority similar to that in § 994 for the issuance of regulations, nevertheless the Secretary has prescribed regulations under § 993 that trade receivables representing commissions due from unrelated principals may be treated as qualified export assets but that those due from related suppliers are not to be so treated unless paid within 60 days after the close of the year, to wit (Treas.Reg. § 1.993–2(d)):

(2) Trade receivables representing commissions. If a DISC acts as commission agent for a principal in a transaction described in § 1.993–1(b), (c), (d), (e), (h), or (i) which results in qualified export receipts for the DISC, and if an account receivable or evidence of indebtedness held by the DISC and representing the commission payable to the DISC as a result of the transaction arises * * * such account receivable or evidence of indebtedness shall be treated as a trade receivable. *If, however, the principal is a related supplier* (as defined in § 1.994–1(a)(3)) *with respect to the DISC, such account receivable or evidence of indebtedness will not be treated as a trade receivable unless it is*

*payable and paid in a time and manner which satisfy the requirements of § 1.994–1(e)(3) * * *.* (Emphasis added.)

Plaintiff claims that the § 1.993–2(d)(2) regulatory exclusion from qualified assets at the close of the year of an account receivable representing commissions due from a related supplier merely because they were paid more than 60 days after the close of the year is unauthorized, arbitrary, legislative in character and contrary to the DISC statute.

Defendant relies wholly upon the reasoning of the Tax Court in *CWT Farms v. Commissioner,* 79 T.C. 1054 (1982) *(appeal docketed,* No. 84–8012 (11th Cir. Jan. 4, 1984) [2] to sustain the validity of the regulation. There the court found authority for the regulation in I.R.C. § 7805(a) which generally authorizes the Secretary of the Treasury to "prescribe all needful rules and regulations for the enforcement of" the revenue statutes. It noted that the inquiry of the courts is "generally limited to the question whether the regulation implements the congressional mandate in some reasonable manner * * *, or in other words, whether the challenged regulation harmonizes with the plain language of the statute, its origin, and purpose." *CWT Farms,* 79 T.C. at 1061–62.

It held the challenged regulation to be a permissible interpretation of the language of § 993(b)(3) because it found such language to be "anything but unambiguous." *Id.* at 1063.

Section 993(b)(3) provides in pertinent part that—

the qualified export assets of a corporation are—

&ast; &ast; &ast; &ast; &ast; &ast;

(3) accounts receivable * * * which arise by reason of transactions of such corporation * * * described in subparagraph (A), (B), (C), (D), (G) or (H), of subsection (a)(1).

---

**2.** Also followed in *Fritzche Dodge & Olcott, Inc. v. Commissioner,* 45 T.C.M. 607 (1983) and *Le-Croy Research Systems Corp. v. Commissioner,* 47 T.C.M. 1345 (1984), *appeal docketed,* No. 84–4062 (2d Cir. Apr. 25, 1984).

The transactions referred to in subparagraph (A) are "the sale, exchange, or other disposition of export property."

The Tax Court thought that since the qualified accounts receivable are those "which arise by reason of transactions [sales] of such corporation [the DISC]", and a commission DISC has no sales of its own the "accounts receivable" in question is susceptible of an interpretation excluding those of a commission agent. Hence, the Tax Court reasoned, "the extent to which Congress intended commissions receivable owed by the producer to the related DISC to constitute qualified export assets is unclear * * * [and] the challenged regulation can in no way be said to contradict or limit the 'unambiguous' language of section 993(b)(3)."

However, in the light of the entire statute this court finds the alleged ambiguity to be more apparent than real. That Congress intended to allow a DISC to operate as a commission agent as well as a reseller of goods and services is implicit in § 993(f), which defines the term "gross receipts" to include the gross receipts on the sale or rent of property even where the DISC receives only commissions on the sale by the supplier, and in § 994(b), which authorizes the Secretary to prescribe rules for the allocation of income between DISC and supplier "in the case of commissions." If a commission DISC, which ordinarily could not be expected to have substantial tangible assets, were required to exclude its commissions receivable from qualified export assets while including them in total accrued assets, it is problematical how many, if any, of such agents could qualify as DISCs under the 95 percent qualified export assets test. To avoid disqualification of commission DISCs "accounts receivable * * * which arise by reason of transaction of such corporation [the DISC]" must necessarily be understood to include sales in which the DISC is assigned by the producer the role of commission agent rather than reseller.

Finally, even if there were an ambiguity with respect to whether or not the accounts receivable which arise by reason of sales transactions of the DISC include those sales in which the DISC is merely the agent, it has been resolved by provisions of Treas.Reg. § 1.993–2(d)(2) other than the 60-day payment requirement. The regulation unconditionally includes in accounts receivable which arise by reason of transactions of the DISC commissions receivable from any producer other than a related one no matter when paid. It also includes commissions receivable from a related supplier if paid within 60 days after the close of the year. The requirement that the commissions receivable from the latter be collected within the 60 days may not reasonably be deemed to be merely an interpretation of any statutory phrase but is an additional requirement superimposed thereon for another purpose.

In a second prong of its reasoning the Tax Court came to grips with such other purpose. It held that the validity of the 60-day payment provision of § 1.993–2(d)(2) may be sustained as a reasonable means of preventing the use of uncollected commissions receivable as a device to frustrate the "producer's loan" provisions of the legislation, which restrict the uses for which a DISC may lend its tax-free funds to an export producer while continuing to treat the obligation as a qualified export asset of the DISC. *CWT Farms,* 79 T.C. at 1066–67. Section 993(d) provides that such a loan must be evidenced by an instrument with a stated maturity of not more than 5 years; it may only be made to a person engaged in the United States in the manufacturing, production, growing or extraction of export property; it must be designated as a producer's loan when made; it is limited by a formula to the amount of the borrower's export related assets; and it is further limited to the extent that the borrower increases its investment in export related inventory and plant plus research and experimental expenditures during the year. The court stated that if the regulation cannot be justified under the grant of regulatory authority in § 994(b) it can again be justified under the general author-

ity of § 7805 as a reasonable interpretation of § 993 dealing with what constitute qualified export assets.

It must be concluded that this justification for the regulation at issue is likewise not sustainable as an interpretation of any statutory language. It is an effort to close a loophole by adding a requirement to the statute which Congress failed to adopt.

As a general matter the regulations of an administrative agency charged with the duty to carry out a congressional mandate are entitled to great weight; but this general principle of deference only sets the framework for judicial analysis and does not displace it. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). It is hornbook law that the Treasury has no power to promulgate a regulation which either adds an exception to or supplies an omission in a statute which it believes Congress should have included but did not. *Commissioner v. Acker*, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); *Helvering v. Credit Alliance Corp.*, 316 U.S. 107, 113, 62 S.Ct. 989, 992, 86 L.Ed. 1307 (1942); *Caterpillar Tractor Co.*, 218 Ct.Cl. at 526, 589 F.2d at 1045; *Durbin Paper Stock Co. v. Commissioner*, 80 T.C. 252, 261 (1983).

In some instances Congress has delegated to the Treasury authority to adopt legislative or rule-making regulations with appropriate standards necessary to the administration and enforcement of broad statutes with varieties of applications and opportunities for tax avoidance which Congress could not reasonably anticipate upon enactment. *See, e.g.*, I.R.C. §§ 453 (relating to accounting for income on installment sales), 611(a) (allowing a reasonable allowance for depletion), and 1502 (relating to consolidated returns). And such regulations have been upheld as having the force of law. *Commissioner v. South Texas Lumber*, 333 U.S. 496, 503, 68 S.Ct. 695, 699, 92 L.Ed. 831 (1948); *Commissioner v. Portland Cement Co. of Utah*, 450 U.S.

156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *American Standard, Inc. v. United States*, 220 Ct.Cl. 411, 416–17, 602 F.2d 256, 260 (1979); *Garvey v. United States*, 1 Cl.Ct. 108, 113 (1983), *aff'd*, 726 F.2d 1569 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 99, 83 L.Ed.2d 44 (1984). But § 7805 has been held not to be a source of delegation of such legislative authority. *Vogel Fertilizer Co.*, 455 U.S. at 24, 102 S.Ct. at 827; *Rowan Cos. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981).

The vice in defendant's adoption of the regulatory requirement that payment of commissions receivable is to be made within 60 days of the close of the year on pain of rejection of the account as a qualified export asset is that it attempts to resolve a question of substance versus form by making conclusive against the taxpayer what would otherwise be only a single factor in that factual inquiry. It denies the taxpayer the opportunity to prove that the funds which could have been used to pay the commissions were in fact used by the related supplier as export assets for purposes consistent with those permissible for producer's loans. And it also makes irrelevant any proof that the failure of the agent to receive payment of the commissions within the 60 days may have been for bona fide reasons, such as hardship, inadvertence, failure of the customer to make prompt payment, uncertainty as to amount or difficulty in computation, rather than as a device to circumvent the producer's loan restrictions. In so doing it imposes an additional arbitrary requirement not found in or authorized by any statutory provision.[3]

In other instances where Congress has concluded that actual payment within a limited period after the close of the taxable year should be a proper test of the bona fides of accruals of claimed obligations for expenses owed to related taxpayers, it has not deemed the general authorization to the Secretary of the Treasury to adopt

---

**3.** The fact that defendant concedes that, if the challenged regulation is invalid, it has no other defense on the merits also tends to support the inference that the regulation is arbitrary as applied to the plaintiff's circumstances in this case.

needful regulations sufficient to allow him to disallow such obligations. It has reserved for itself the express delineation of the kinds of expenses which may be disallowed, the number of days in which payment must be made, and the nature of the pertinent relationship between the taxpayers. I.R.C. § 267 disallows deductions, which would otherwise be allowable, for the amounts of accrued trade or business expenses (under § 162), for interest (under § 163), and for expenses for the production of income or conservation of property held for the production of income (under § 212), which are not includible in the income of the related taxpayer unless received, if they are not paid within 2½ months of the close of the taxpayer's taxable year. At the least, it would be anomalous to conclude that Congress authorized the Treasury in its discretion to disallow an obligation as lacking in bona fides if the taxpayer did not pay it within 60 days after the close of the taxable year, while Congress itself thought a taxpayer should have 2½ months to make payment of an accrued obligation to a related taxpayer before it is deemed not bona fide.

Defendant seeks to draw some inference favorable to the validity of the challenged regulation from the fact that plaintiff does not contest the validity of Treas.Reg. § 1.994–1(e)(3)(i), which, *for purposes of the intercompany pricing rules,* provides that "[t]he amount of a transfer price (or reasonable estimate thereof) actually charged by a related supplier to a DISC, or a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transactions occurred". But there are significant differences between § 1.994–1(e)(3)(i) and § 1.993–2(d)(2). I.R.C. § 994(b) directs the Secretary to prescribe rules for the application of that section in the case of commissions, rentals and other income, whereas neither I.R.C. §§ 992 nor 993, which set forth the prerequisites for qualification as a DISC has any comparable direction or authorization. Moreover, the consequence of a violation of § 1.994–1(e)(3)(i), which deals with failure to pay the purchase price, as well as commissions, within 60 days, may be far less severe. It results only in a change in the allocation of the income; whereas violation of § 1.993–2(d)(2), by failure to pay commissions within the 60 days, causes disallowance of the account payable as a qualified export asset and may result in the complete termination of DISC qualification and taxation of its entire accumulated income to its shareholder in a single year. *See* I.R.C. § 995(b)(2).

In any event, it is unnecessary to decide at this time whether or not § 1.994–1(e)(3) is valid, since it is sufficient for purposes of the instant case that adoption of the portion of that regulation dealing with commissions, to disqualify a corporation as a DISC under the § 992 test, is in itself unauthorized.

*Conclusion*

Defendant conceded in its brief and on oral argument that if Treas.Reg. § 1.993–2(d)(2) is not dispositive of plaintiff's complaint it has no other defense on the merits. Since it is determined herein that the regulation is invalid, the pleadings and admissions on file indicate that there is no genuine issue of material fact and that plaintiff is entitled to judgment as a matter of law.

The pleadings indicate that, as a result of the Commissioner's deficiency assessment attributable to the issue decided herein, for the year 1977 plaintiff overpaid $312,803 and for 1978 $140,917 in taxes, together with assessed interest of $123,053.16, and that payment of the $576,773.16 total was made on March 8, 1981. Plaintiff is entitled to refund of this sum with interest from March 8, 1981, as provided by law, and the clerk is directed to enter judgment accordingly.