**STOKELY–VAN CAMP, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 582–88T.**

United States Claims Court.

Nov. 2, 1990.

Robert H. Aland, Chicago, Ill., Atty. of Record, for plaintiff. Neal J. Block, Karen A. Kuenster, Julie B. Floyd, and Baker & McKenzie, of record.

Kenneth C. Gobetz, Washington, D.C., with whom was Asst. Atty. Gen., Shirley D. Peterson and Gerald B. Leedom, Dept. of Justice, for defendant.

## OPINION

HARKINS, Senior Judge.

Stokely–Van Camp, Inc. (SVC), plaintiff, in its complaint filed October 6, 1988, seeks refunds of federal income taxes, with interest, with respect to tax years ending May 31, 1978 through May 31, 1982.[1] The complaint in Count I claims a refund of $1,930,-490 based on commissions purportedly paid to Stokely–Van Camp Overseas, Inc. (SVCO), a Domestic International Sales Corporation (DISC). The claims in Count II concern payments made by SVC in 1981 and 1982 to redeem its stock. The refund claimed in Count II totals $8,350,522 for tax years 1981 and 1982, or, in the alternative, a total of $535,516, based on amortization of a 1981 redemption payment over a 5–year period. Count II included a claim for a carryback to tax year 1979 of credits resulting from certain payments made in 1982. The carryback of credits resulted in a claimed refund amounting to $2,106,124 for tax year 1979. Total refunds claimed in the complaint amount to $12,387,136.

SVC primarily is a processor of food products whose business includes the manufacture of high quality food products, and marketing and distribution, through retail grocery stores and to institutional distributors and industrial users. During the years in issue, SVC's stock was publicly

---

1. The years at suit antedate the Tax Reform Act of 1986, and the refund claims in this case are based on provisions of the Internal Revenue Code (IRC) in effect in 1982. Unless otherwise specified, all references are to the Internal Revenue Code of 1954, as amended, codified in 26 U.S.C. §§ 991–997 (1982).

held, with the largest single shareholder owning approximately 11 percent of the outstanding shares of common stock. Its original federal income tax returns for tax years 1978–82 were filed as an independent company. On October 31, 1983, SVC was acquired by the Quaker Oats Company (Quaker). After the acquisition, separate corporate federal income tax returns continued to be filed for SVC.

On or about January 26, 1984, SVC filed amended U.S. Corporation Income Tax Returns (Form 1120X) for taxable years May 31, 1978 through May 31, 1980, and on February 15, 1984, amended returns (Form 1120X) were filed for tax years ending May 31, 1981 and May 31, 1982 (1984 Amendments). Amended U.S. Corporation Income tax returns (Form 1120X) were filed on October 14, 1986, for taxable years ended May 31, 1979, 1981 and 1982 (1986 Amendments). The following chart sets forth Total Income (line 11 of Form 1120), Tax (line 31 of Form 1120), and Refund (line 15 of Form 1120X) from SVC's income tax returns for the years in issue.

## STOKELY–VAN CAMP, INC.

| | Original Return (as adjusted) | 1984 Amendments | 1986 Amendments |
|---|---|---|---|
| **Total Income** | | | |
| 1978 | $ 76,526,727 | $ 76,765,924 | |
| 1979 | 93,965,764 | 94,348,843 | 94,068,158 |
| 1980 | 85,223,970 | 85,641,159 | |
| 1981 | 83,460,640 | 83,966,013 | 83,460,640 |
| 1982 | 105,271,489 | 106,130,330 | 105,292,786 |
| **Tax** | | | |
| 1978 | 6,246,382 | 5,960,630 | |
| 1979 | 9,178,157 | 8,675,051 | 7,072,033 |
| 1980 | 5,840,516 | 5,391,510 | |
| 1981 | 3,691,240 | 3,408,967 | 1,295,135 |
| 1982 | 5,987,356 | 5,577,003 | 94,998 |
| **Refund Claimed** | | | |
| 1978 | | 285,752 | |
| 1979 | | 503,106 | 2,106,124 * |
| 1980 | | 449,006 | |
| 1981 | | 282,273 | 2,455,572 * |
| 1982 | | 410,353 | 5,894,950 * |

* or such other amount as is legally refundable, together with interest as provided by law.

---

Plaintiff's claims came before the court on cross-motions for partial summary judgment. Oral argument was heard on February 13, 1990, on the claims in Count II, and on September 27, 1990, on the claims in Count I. The facts have been stipulated or are established in the record, there is no genuine issue as to any material fact, and disposition by summary judgment is appropriate. For the reasons that follow, defendant prevails.

## COUNT I

Refunds claimed in Count I are based upon the statutes, IRC §§ 991–997, and regulations applicable to the DISC program in tax years 1978 through 1982. The DISC program was instituted in 1971 by amendment to the Internal Revenue Code, effective for tax years beginning January 1, 1972, to provide special tax treatment of income from foreign sales through the use of a vehicle known as a Domestic International Sales Corporation.

The DISC program was enacted to grant tax incentives as a means of placing domestic corporations engaged in export activities in a better position with corporations that used foreign subsidiaries. Prior to the enactment of the DISC provisions, domestic corporations were taxed on their foreign earnings regardless of whether those earnings were kept abroad or brought back into the United States. Corporations using foreign subsidiaries, however, generally were taxed only on their foreign earnings when they were repatriated.[2]

If a corporation qualifies as a DISC, it is entitled to certain income tax benefits. The technique employed was a deferral of federal tax on income derived from exports. Under the statute, a domestic company could organize a DISC as a "shell" corporation whose sole function would be its use as an accounting device to measure the amount of export earnings subject to tax deferral. The DISC itself is not subject to tax. IRC § 991. Instead, certain items of DISC taxable income (including, most importantly, a specified percentage of sales income) are taxed currently to its shareholders as a constructive dividend, regardless of whether such income is actually distributed. IRC § 995. The remainder of the DISC's current taxable income (called "accumulated DISC income") is not taxable to its shareholders until it is distributed or deemed distributed to the shareholders, the shareholders dispose of their stock in the DISC, or the DISC loses its special status. IRC §§ 995(b) and (c). Thus, the primary benefit of conducting transactions through a DISC was the deferral of federal income tax on a portion of the profit realized.

The provisions of the IRC dealing with DISCs were amended in 1975, 1976 and 1982. In 1984, the DISC program, except for interest charge DISCs, was replaced with provisions applicable to Foreign Sales Corporations (FSC), effective for taxable years beginning after December 31, 1984. The 1984 IRC Amendments provide that accumulated DISC income derived before January 1, 1985, would be treated as having been previously taxed. This action forgave the tax on most DISC income that had not been previously taxed.[3]

Facts

SVCO, plaintiff's DISC, was a wholly-owned subsidiary that had been incorporated as a Delaware corporation on January 27, 1927, and which had elected under IRC § 992(b) and filed Form 4876 (Election To Be Treated as a DISC), dated December 15, 1972, to be effective for the taxable year beginning January 1, 1973. SVCO timely filed annual returns as a DISC for taxable years ending December 31, 1977, through December 31, 1981, on Forms 1120–DISC.

Forms 1120–DISC are designed to elicit a large volume of information concerning the nature and volume of business attributed to a DISC. For each of the taxable years ending December 31, 1977, through December 31, 1981, SVCO on its original returns reported information that established it did no business as a DISC during that period. Item G of Form 1120–DISC has three boxes in which to check the method used for inter-company pricing: (1) 50–50 combined taxable income method, (2) 4 percent gross receipts method, and (3) section 482 method. On SVCO's original returns, none of the boxes were checked, and each Item G included "Corporation is inactive—no receipts."

Each original return, in Schedule K "Additional Information Required", reports "inactive" for business activity (Item J), and the following questions each were answered "no" (Item M):

(1) Did 95% or more of your gross receipts for the taxable year consist of qualified export receipts (as defined in section 993(a))?

(2) Did the adjusted basis of your qualified export assets (as defined in section

2. For a discussion of the DISC statutory scheme see *Thomas International Ltd. v. United States,* 6 Cl.Ct. 414, 416–17 (1984), *rev'd,* 773 F.2d 300 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986); *Caterpillar Tractor Co. v. United States,* 589 F.2d 1040, 218 Ct.Cl. 517 (1978).

3. Tax Reform Act of 1984, Pub.L. No. 98–369, div. A, title VIII, §§ 801(a) & 805(b)(2)(A) (July 18, 1984), 98 Stat. 985–91, 1001 (codified at 26 U.S.C. §§ 921–927 (Supp. V 1982)).

993(b)) at the close of the taxable year equal or exceed 95% of the sum of the adjusted basis of all your assets at the close of the taxable year?

(3) If the answer to (1) or (2) is "no", did you make a pro rata distribution of property as defined in section 992(c)?

Each original return reported "none" for "qualified export receipts" (Schedule B(1)(c) and (2)(J)) and "none" for "nonqualified gross receipts" (Schedule B(3)(g)). The only asset reported on SVCO's balance sheet was "Intercompany Account Receivable—$2500" (Schedule L(i)).

When it was an independent company, no commissions attributable to its DISC were claimed by plaintiff. For each of its taxable years ending May 31, 1978, through May 31, 1982, plaintiff filed with its federal income tax return a Form 5713—International Boycott Report. In each such report, plaintiff responded it was a stockholder of a DISC, identified SVCO as the DISC, and identified SVCO as an "inactive corp." (Form 5713, p. 2, item (c)).

On January 26, 1984, SVCO filed amended Forms 1120–DISC for its taxable years ending December 31, 1977, through December 31, 1981. For each taxable year, SVCO's amended returns reported the following (Form 1120–DISC, line 12; Schedule B(a)(6)):

## COMMISSION SALES

| Taxable Year | Taxable Income | Gross Receipts | Commission |
|---|---|---|---|
| 1977 | 478,393 | $2,172,961 | $ 478,393 |
| 1978 | 766,157 | 3,717,775 | 766,157 |
| 1979 | 810,151 | 3,843,770 | 810,151 |
| 1980 | 1,010,746 | 4,806,606 | 1,010,746 |
| 1981 | 1,601,008 | 7,866,228 | 1,601,008 |

In the January 26, 1984, amendments, SVCO reported as a commission DISC, i.e., it functioned as a commission agent for plaintiff. The amount of commission for such a DISC is determined under one of the three pricing methods listed in Item G of Form 1120–DISC. In the amendments, SVCO checked the box for the 50–50 combined taxable income method as the method used to compute commissions due from plaintiff. None of the commissions reported on SVCO's amended returns were paid within 60 days of the close of the relevant taxable year.

Plaintiff's 1984 Amendments were filed on January 26, 1984, for tax years ending May 31, 1978, through May 31, 1980, and on February 10, 1984, for tax years ending May 31, 1981, and May 31, 1982. The refunds claimed in the 1984 Amendments, set forth above, total $1,930,490.

Quaker on February 28, 1984, by wire transfer, sent $5,222,321 to SVCO to pay for plaintiff's "commission expenses" for the taxable years in issue. Prior to February 28, 1984, no commissions were paid to SVCO for any of the taxable years. Plaintiff did not record on its books and records any commission due to SVCO until February and March 1984.

Plaintiff's refund claims in the 1984 Amendments were examined by the IRS and commissions on the amended DISC returns for years ending December 31, 1978, through December 31, 1982, were not allowed. The original SVCO returns were determined to be correct as filed. The IRS examiner's report was attached to a "30–day" letter dated September 13, 1985. After further audit, the amended DISC returns again were not allowed, and the original SVCO returns for years 1978 through 1982 were determined to be correct as filed, with no commissions earned by SVCO. A copy of the IRS international examiner's report, showing the final audit results, accompanied a "30–day" letter dated March 6, 1986, to plaintiff. By letter dated October 20, 1986, the IRS denied the portions of

the claims for refund filed by plaintiff on January 26, 1984, relating to the DISC issues.

Disposition

To qualify as a DISC, a corporation must satisfy a series of specific conditions. The statutory criteria include income and assets tests, a specified capital structure, and an election to be treated as a DISC that is in effect for the taxable year.[4] The assets test requires that the adjusted basis of the corporation's "qualified export assets" at the close of the taxable year equal at least 95 percent of the adjusted basis of all of its assets at the close of the taxable year. The various types of export or related assets specified in the definition of "qualified export assets" includes accounts receivable and evidence of indebtedness of the DISC. The purpose of the assets test is to insure that the DISC's assets, including its tax deferred income, actually are used for export activities, and are not diverted to either production for the domestic market or for manufacturing overseas.[5]

Explicit authority is provided by the statute for promulgation of regulations to deal with the status of a corporation which has filed a return as a DISC for a taxable year, but has failed to satisfy the statutory DISC criteria.[6] This authority has been implemented by Treasury Regulation.[7]

---

4. IRC § 992(a)(1) provides:
   (1) DISC
   For purposes of this title, the term "DISC" means, with respect to any taxable year, a corporation which is incorporated under the laws of any State and satisfies the following conditions for the taxable year:
   (A) 95 percent or more of the gross receipts (as defined in section 993(f)) of such corporation consist of qualified export receipts (as defined in section 993(a)),
   (B) the adjusted basis of the qualified export assets (as defined in section 993(b)) of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year,
   (C) such corporation does not have more than one class of stock and the par or stated value of its outstanding stock is at least $2,500 on each day of the taxable year, and
   (D) the corporation has made an election pursuant to subsection (b) to be treated as a DISC and such election is in effect for the taxable year.

5. *Thomas International Ltd. v. United States,* 773 F.2d at 301; *CWT Farms Inc. v. Commissioner,* 755 F.2d 790, 796, 801 (11th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

6. IRC § 992(a)(2) provides:
   (2) Status as a DISC after having filed a return as a DISC.
   The Secretary shall prescribe regulations setting forth the conditions under and the extent to which a corporation which has filed a return as a DISC for a taxable year shall be treated as a DISC for such taxable year for all purposes of this title, notwithstanding the fact that the corporation has failed to satisfy the conditions of paragraph (1).

7. The Treasury Regulations relevant to the DISC claims appear in 26 C.F.R. §§ 1.991–1 to 1.997–

1. References to the Treasury Regulations are to applicable sections, with "26 C.F.R." omitted. Section 1.992–1(g) provides:

   (g) *Status as DISC after having filed return as a DISC.* Under section 992(a)(2), notwithstanding the failure of a corporation to meet the requirements of paragraph (a) of this section for a taxable year, such corporation will be treated as a DISC for purposes of the Code for such taxable year (and, thus, will not be able to claim that it is not eligible to be a DISC) if—
   (1) Such corporation files a return as a DISC for such taxable year,
   (2) Such corporation does not notify the district director, more than 30 days before the expiration of the period of limitation (including extensions thereof) on assessment for underpayment of tax for such taxable year (as determined under section 6501 and the regulations thereunder), that it is not a DISC for such taxable year, and
   (3) The Internal Revenue Service has not issued, within such period of limitation (including extensions thereof) on assessment for underpayment of tax for such taxable year, a notice of deficiency based on a determination that such corporation is not a DISC for such taxable year.
   A corporation is treated as a DISC, for all purposes, pursuant to the provisions of this paragraph for any taxable year for which it meets the requirements of this paragraph, even if such corporation is an ineligible corporation described in paragraph (f) of this section for such taxable year. Thus, for example, a corporation which is treated as a DISC for a taxable year pursuant to this paragraph is treated as a DISC for that taxable year for purposes of § 1.992–2(e)(3) (relating to the termination of a DISC election if a corporation is not a DISC for each of any 5 consecutive taxable years). If a corporation is treated as a DISC for a taxable year pursu-

Regulations designed to implement the statutory scheme were proposed on May 20, 1972.[8] When the DISC regulations were issued in final form on September 25, 1974, they were accompanied by Treasury Decision 7323.[9] The part of the preamble to T.D. 7323 that relates to Section 1.992–1(g) states:

Section 1.992–1(g), as proposed, is amended to indicate that the provision is not a relief measure. A corporation will generally be treated as a DISC only if it satisfies the requirements for qualification as a DISC. A corporation which fails (through inadvertence or otherwise) to meet all of those tests for a taxable year might, nonetheless, seek the benefits of being a DISC by filing a return as a DISC. It may later appear to the corporation that it is more beneficial not to be treated as a DISC for that year. If the conditions of § 1.992–1(g)(1), (2), and (3) are met, that corporation will not be able to avoid being treated as a DISC by reason of its failure to meet all the qualification requirements for the year.

Plaintiff argues that the authority conferred in IRC § 992(a)(2), and the terms of Section 1.992–1(g), require SVCO to be treated as a DISC "for all purposes" of the IRC for its 1977–1982 taxable years. Plaintiff's reasoning is based on the following: (1) SVCO filed 1120–DISC returns for each of its 1977 through 1982 taxable years; (2) at all times SVCO took the position that it was a qualified DISC, and never notified the IRS that it was not a DISC for any of those years; (3) the IRS never issued a statutory notice of deficiency to SVCO for any of the years, and (4) the statute of limitations has expired for the issuance of such notice. In summary, plaintiff argues Treasury Regulation § 1.992–1(g) effectively provides that once a corporation has filed its return for a taxable year as a DISC, does not notify the Commissioner that it is not a DISC for that year and the statute of limitations has expired for the issuance of a notice of deficiency for that year, "a corporation is treated as a DISC *for all purposes*" (emphasis added).

Plaintiff states the language of Section 1.992–1(g) is clear and unequivocal, and under the plain meaning rule there is no room for interpretation or use of extrinsic evidence of intent. Once a corporation meets its conditions, plaintiff argues, the regulation requires it to be treated as a DISC "for all purposes." Plaintiff's focus on Section 1.992–1(g) and reliance on the plain meaning rule is misplaced.

In the first place, the regulation on its face does not apply to plaintiff. Section 1.992–1(g) in pertinent part states "... such corporation will be treated as a DISC for purposes of the Code for such taxable year (and thus, will not be able to claim that it is not eligible to be a DISC) if— ...." Plaintiff's interpretation of the regulation does not give effect to the parenthetical clause. Plaintiff's interpretation is incomplete, and is inconsistent with the regulation's specific provisions. In this case, plaintiff never has claimed that it is not eligible to be a DISC, and the provisions of Section 1.992–1(g) do not apply.

■ As a minimum, the parenthetical clause in Section 1.992–1(g) generates ambiguity as to the meaning of the remainder of the regulation. The plain meaning rule cannot be applied where the words employed clearly are ambiguous. Nor should the rule apply if it produces results that are nonsensical in relation to the remainder of the statutory and regulatory framework.

In the DISC program, the statute not only defines explicitly the conditions a corporation must meet to be eligible as a DISC (IRC § 992(a)(1)), but it also defines with particularity the terms that are in the requirements (IRC § 993—Definitions). Plaintiff's interpretation, which concen-

ant to this paragraph, persons who held stock of such corporation at any time during such taxable year are treated, with respect to such stock, as holders of stock in a DISC for the period or periods during which they held such stock within such taxable year.

8. 37 Fed.Reg. 10,366 (1972).

9. T.D. 7323, 1974–2 C.B. 225, 226.

trates on one subsection of the statute—IRC § 992(a)(2), serves to obscure the meaning of related parts of the statute and developments in the DISC program over time.

The Supreme Court has observed that the true meaning of a single section of a statute in a setting as complex as that of the revenue acts, however precise its language, cannot be ascertained if it be considered apart from related sections, or if the mind be isolated from the history of the income tax legislation of which it is an integral part.[10] The DISC program has been noteworthy for its complexity. The DISC provisions "quickly reach, and rarely leave, a plateau of statutory intricacy seldom rivaled in other sections of the Code." [11]

Plaintiff's interpretation of the interplay between IRC § 992(a)(2) and regulation Section 1.992–1(g) produces a result in which the IRS by regulation overrides explicit statutory requirements that were designed to insure that tax-deferred profits are devoted to export purposes. Plaintiff's interpretation also permits imaginative accounting innovations to produce monetary refunds derived from activities of a corporation that was inactive during the years in issue, and which had reported that it did not meet the required income and assets tests.

IRC § 992(a)(2) mandates the Secretary to prescribe regulations that establish the conditions under which a corporation shall be treated as a DISC, notwithstanding the fact that the corporation has failed to satisfy the DISC required criteria. This grant of authority is specific as to a particular phase of the DISC program, and is supplementary to the Secretary's general authority to prescribe all needful rules and regulations for enforcement of the IRC.[12]

The terms of this specific authority do not mandate the conclusion that the Secretary was given plenary power to issue a regulation that would negate the essential conditions of the statute. The Secretary is not provided with authority to establish a general exception to the requirement that a DISC must qualify under IRC § 992(a)(1). The Secretary was authorized to promulgate a regulation to deal with qualification of a corporation that has failed to satisfy statutory requirements, and thus would be able to disclaim DISC status, but is nonetheless to be treated as a DISC.

It is appropriate to look at the legislative history to see if Congress expressed any legislative intent contrary to the court's conclusion based upon the plain language of the statute.[13] The legislative history, as to IRC § 992(a)(2), confirms the analysis of the statutory terms, and makes it clear that the purpose of the authority granted to the Secretary was limited and specific. Both the Senate and House Reports state:

> In addition, provision is made for regulations to provide rules dealing with a corporation which has filed a return as a DISC and subsequently claims that it is not eligible for DISC status. The regulations would provide that in the case of a corporation which has not indicated more than 30 days before the running of the statute of limitations for the year that it is not a DISC and has filed a tax return as if it were a DISC, then the corporation (and its shareholders with respect to distributions or deemed distributions from the corporation) is to be treated as if it were a DISC for the year in question, if the Internal Revenue Service has not issued a notice of deficiency based upon a determination that the corporation was not a DISC.[14]

---

**10.** *Commissioner v. Engle,* 464 U.S. 206, 223, 104 S.Ct. 597, 607, 78 L.Ed.2d 420 (1984) (quoting *Helvering v. Morgan's Inc.,* 293 U.S. 121, 126, 55 S.Ct. 60, 62, 79 L.Ed. 232 (1934)).

**11.** B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders,* ¶ 17.14, at 17–43 (4th ed. 1979).

**12.** 26 U.S.C. § 7805(a). *See also Gehl Co. v. Commissioner,* 795 F.2d 1324, 1328–29 (7th Cir. 1986).

**13.** *Gannet v. United States,* 877 F.2d 965 (Fed. Cir.1989).

**14.** S.Rep. No. 92–437, 92nd Cong., 1st sess., 61 (1971); H.R.Rep. No. 92–533, 92nd Cong., 1st sess., 93–94 (1971).

Plaintiff does not argue that Section 1.992–1(g) is an invalid implementation of the Secretary's authority. Plaintiff contends the IRS application of its own regulations is invalid, and suggests that, if the IRS intended the regulation to have the meaning that defendant advocates, the IRS draftsmen lacked skill or were incompetent. Essentially, plaintiff argues that if the terms of the statute and regulation can be interpreted to produce the results plaintiff seeks, they must be so interpreted. Plaintiff does not give recognition to wide discretion vested in the Secretary to promulgate needed rules to implement the DISC provisions, or to the court's function when a regulation is capable of more than one interpretation.

■■■ Deference routinely is granted to regulations needed for enforcement of the tax laws and the collection of taxes. The amount of deference to be given is substantial. The regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes, and should not be overruled except for weighty reasons."[15] A court may, where appropriate, substitute its judgment for an agency's when the regulation is "interpretative" as opposed to "legislative."[16] Where the statutory language is unclear, a term may be found to be "so general ... as to render an interpretative regulation appropriate."[17] A valid regulation, which is legislative in nature, has the same effect as a valid statute.[18] The source of regulation, however, is the statute. The question is not what interpretation the court would give to the statute were it the IRS. The issue to be decided is whether the statute is capable of more than one interpretation and whether the IRS interpretation is reasonable.[19] The court's role is limited; its function is to sustain the Treasury regulations "unless unreasonable and plainly inconsistent with the revenue statutes."[20]

The IRS implementation of the authority given in IRC § 992(a)(2) to prescribe by regulation when a corporation, having filed as a DISC but later disclaims DISC status, is reasonable. On the facts in plaintiff's claim in Count I, Section 1.992–1(g) does not apply.

■■■ Defendant, in its cross-motion for summary judgment on the DISC issue, argues that SVCO's original returns were adequate to constitute sufficient notice to the IRS that it was not a qualified DISC for the taxable years. The original returns were filed timely, and they were accepted by the IRS, and considered by the examiners, as DISC tax returns. Further, after final audit, the international examiner's report concluded the "zero taxable income reported on the original DISC returns for years 1978 through 1982 is correct as filed." SVCO's election to be a DISC was not changed by the inactivity reported on its original returns. The disqualification of SVCO as a DISC, and the disallowance of commissions to SVCO and plaintiff's com-

15. *Minnesota Power & Light Co. v. United States,* 782 F.2d 167, 170 (Fed.Cir.1986) (quoting *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978) (citations omitted)); *see also Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *Thomas International Ltd. v. United States,* 773 F.2d 300, 303 (Fed.Cir. 1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986); *Greenacre Foundation v. United States,* 762 F.2d 965, 967 (Fed.Cir.1985); *Massachusetts Mut. Life Ins. Co. v. United States,* 761 F.2d 666, 671 n. 7 (Fed.Cir.1985); *Rowe v. United States,* 655 F.2d 1065, 1067, 228 Ct.Cl. 269 (1981).

16. *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

17. *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979) (upholding regulation where the term "business league" had no well-defined meaning or common usage outside the perimeters of the Code section in which it was referred).

18. *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).

19. *Texas State Commission for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987).

20. *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 699, 92 L.Ed. 831 (1948) (citations omitted)).

mission expense deductions on the amended returns, were not based on any notice that SVCO was not a DISC. Defendant's contention that SVCO was disqualified because its original returns constituted notice that it was not a DISC is without merit.

The IRS audit was concerned with SVCO's amended returns for taxable years December 31, 1977, through 1982, and plaintiff's amended returns for fiscal years May 31, 1978, through 1983. In the audit of the amended returns, the IRS concluded that the commission amounts wire-transferred to SVCO on February 28, 1984, did not qualify under IRC § 993 as export assets, and that they exceeded the 5 percent limitation of IRC § 992(a)(1)(B). As a result, SVCO was considered to be a nonqualified DISC for each of the years 1977 through 1982. Under IRC § 482, SVCO's accounts receivable for commissions were allocated to plaintiff as necessary to reflect clearly plaintiff's income. This process was accomplished by deemed distributions by plaintiff for fiscal years May 31, 1978, through 1982, that were made to acknowledge the amended SVCO returns, and elimination of the deemed distributions for those fiscal years due to SVCO's disqualification.

The disallowance of SVCO's amended returns resulted in no changes to its taxable years December 31, 1978, through 1982, and no commission expense was allowed to plaintiff. Changes were required, however, for plaintiff's amended returns for part of the fiscal year ending May 31, 1983.

Commissions were timely paid for the period January 1, 1983, to May 5, 1983, and the commission expense was allowed on plaintiff's return for this period.

The narrow issue that controls plaintiff's claim is the proper treatment to be given to the accounts receivable that appeared on the 1984 Amendments to SVCO's returns. This issue is controlled by the regulations that implement the provisions of IRC §§ 993(b)(3) and 994(b)(1). The Treasury Regulations in Sections 1.993–2(d), 1.994–1(e)(3) and 1.994–1(e)(5) describe the circumstances under which commissions owed to a DISC by a related supplier constitute qualified export assets.

SVCO's commissions in its amended returns under the regulations may not be treated as trade receivables, and thus qualify as export assets, "unless it is payable and paid in a time and in a manner which satisfy the requirements of" Section 1.994–1(e)(3), relating to initial payment of transfer price or commission, or Section 1.994–1(e)(5), relating to procedure for adjustments to transfer price commission. An indebtedness for an initial commission arising under Section 1.994–1(e)(3)(iii), is not a qualified export asset, but an adjustment under Section 1.994–1(e)(5)(i) for an indebtedness for a commission may be a trade receivable under certain conditions. The adjustment must be paid timely under Sections 1.994–1(e)(5)(i) and (ii), and it must otherwise satisfy the requirements of Section 1.994–1(e)(2).[21]

21. Sections 1.993–2(d)(2) and (3) provide:

(2) Trade receivables representing commissions. If a DISC acts as commission agent for a principal in a transaction described in § 1.993–1(b), (c), (d), (e), (h), or (i) which results in qualified export receipts for the DISC, and if an account receivable or evidence of indebtedness held by the DISC and representing the commission payable to the DISC as a result of the transaction arises (and, in the case of an evidence of indebtedness, designated on its face as representing such commission), such account receivable or evidence of indebtedness shall be treated as a trade receivable. If, however, the principal is a related supplier (as defined in § 1.994–1(a)(3)) with respect to the DISC, such account receivable or evidence of indebtedness will not be treated as a trade receiva-

ble unless it is payable and paid in a time and manner which satisfy the requirements of § 1.994–1(e)(3) or (5) (relating to initial payment of transfer price or commission and procedure for adjustments to transfer price or commission, respectively), as the case may be. However, see subparagraph (3) of this paragraph for rules regarding certain accounts receivable representing commissions payable to a DISC by its related supplier.

(3) Indebtedness arising under § 1.994–1(e). An indebtedness arising under § 1.994–1(e)(3)(iii) (relating to initial payment of transfer price or commission) in favor of a DISC is not a qualified export asset. An indebtedness arising under § 1.994–1(e)(5)(i) (relating to procedure for adjustments to transfer price or commission) in favor of a DISC is a trade receivable if it is paid in the time and manner described in

To qualify as a trade receivable, SVCO's initial sales commission, or a reasonable estimate thereof, must have been actually charged to plaintiff no later than 60 days following the close of SVCO's taxable year during which the transaction occurred.[22] The regulation provides a "safe harbor" test under which a commission will be deemed to be a reasonable estimate. Under this test, if the amount actually paid results in the DISC realizing at least 50 percent of the DISC's taxable income from the transaction as reported in its tax return for the taxable year the transaction is completed, then the amount actually paid shall be deemed to be a reasonable estimate of such commission.[23]

If the district director can demonstrate, based upon data available as of the 60th day after the close of the taxable year, that the amount actually charged did not represent a reasonable estimate of the commission to be determined, an indebtedness will be deemed to arise in an amount equal to the difference between the commission ultimately determined and the amount actually paid and received. This indebtedness is deemed to arise as of the date the transaction occurred which gave rise to the indebtedness. The deemed indebtedness is treat-

ed as an asset, but is not eligible to be treated as a trade receivable or other qualified export asset as of the end of the taxable year in which it is deemed to arise. As a result, the DISC may fail the IRC § 992(a)(1)(B) assets requirement.[24]

When a reasonable estimate of the commission, or the 50 percent safe harbor amount, has been paid within 60 days of the close of the DISC's taxable year as required for initial payments under Section 1.994–1(e)(3), any difference required for compliance with the amounts ultimately determined under IRC § 994 must be adjusted under Section 1.994–1(e)(5). This section provides that if the commission determined under IRC § 994 is different from the commission actually charged, the DISC that received too small a commission shall establish or be deemed to establish an account receivable equal to the difference between the ultimately determined commission and the transfer price previously paid and received. If the account receivable due the DISC is paid within 90 days after it is established or deemed to be established, the account receivable will be treated as a trade receivable, and thus a qualified export asset, as of the end of the taxable year in which the transaction occurred.[25]

---

§ 1.994–1(e)(5)(i) and (ii) and if it otherwise satisfies the requirements of subparagraph (2) of this paragraph. If such an indebtedness is not paid in the time and manner described in § 1.994–1(e)(5)(i) and (ii), it is not a qualified export asset.

**22.** Section 1.994–1(e)(3)(i) provides:

The amount of a transfer price (or reasonable estimate thereof) actually charged by a related supplier to a DISC, or a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transactions occurred.

**23.** Section 1.994–1(e)(3)(iv).

**24.** Section 1.994–1(e)(3)(iii) provides:

If the district director can demonstrate, based upon the data available as of the 60th day after the close of such taxable year, that the amount actually paid did not represent a reasonable estimate of the transfer price or commission (as the case may be) to be determined under section 994 and this section, an indebtedness will be deemed to arise, from

the person required to make the payment in favor of the person to whom the payment is required to be made, in an amount equal to the difference between the amount of the transfer price or commission determined under section 994 and this section and the amount (if any) actually paid and received. Such indebtedness will be deemed to arise as of the date the transaction occurred which gave rise to the indebtedness, except that, if such transaction occurred in a taxable year of the DISC ending on or before August 15, 1975, at the taxpayer's option, the indebtedness will be deemed to arise as of the date by which payment was required under subdivision (i) of this paragraph (e)(3). Such indebtedness owed to a DISC shall be treated as an asset but shall not be treated as a trade receivable or other qualified export asset (see § 1.993–2(d)(3)) as of the end of the taxable year of the DISC in which the indebtedness is deemed to arise.

**25.** Section 1.994–1(e)(5)(i)(a) provides:

If the transfer price (or commission) for a transaction determined under section 994 is different from the price (or commission) actually charged, the person who received too

The IRS reallocation of commissions in plaintiff's amended returns was based on the conclusion that the procedures under Section 1.994–1(e)(5) do not result in the creation of an account receivable eligible for treatment as a trade receivable when the commissions in the initial returns did not qualify under Section 1.994–1(e)(3)(iii) as a trade receivable for the taxable year involved. The IRS position is that Section 1.994–1(e)(5) does not apply to a transaction if the 60–day payment rule has not been met because Section 1.994–1(3)(iii) already has created an account receivable that is not a qualified export asset in an amount equal to the difference between the amount of the commission ultimately determined under IRC § 994 and the amount actually paid and received, *i.e.*, the full amount of the commission that has not been paid within 60 days of the close of SVCO's taxable year.

■ The IRS recognizes that the regulations permit a DISC to file an amended return that increases the DISC's income by computing the commission using a different pricing method than was used on the original return, or, by attributing to the DISC commissions from sales that were not reported on the DISC's original return. The accounts receivable on the amended returns, however, will not be qualified export assets, if (1) the amount required by Sections 1.993–2(d)(2) and 1.994–1(e)(3) to

be paid within 60 days following the taxable year during which the transaction occurred is not a reasonable estimate of the final commission amount reported on the amended return, or, (2) the commission on the additional sales are not covered by the commission agreement entered into between the DISC and its related supplier. The provisions of Section 1.994–1(e)(3), considered as a whole, require that the amount paid within 60 days of the close of the DISC's taxable year must be a reasonable estimate of the commission amount finally determined and reported on the amended return, and not merely of the amount reported on the original return.[26]

Plaintiff contends that, pursuant to Section 1.994–1(e)(5), the commission amounts on its and SVCO's 1984 returns result in accounts receivable as of the end of the DISC's taxable year in which the transaction arose. This argument is supported by the contention that the amended returns constituted a redetermination permitted by Section 1.994–1(e)(4).[27] Even though under normal accrual principles an adjustment for the redetermination may have been made in 1984, the year in which it occurred, plaintiff contends the regulations in Section 1.994–1(e)(5) provide that the redetermination is retroactive to the year of the transactions. Since the ultimate payment was made on February 28, 1984, within 90 days

---

small a transfer price (or commission) or paid too large a transfer (or commission) shall establish (or be deemed to have established), at the date of the determination or redetermination under subparagraph (4) of this paragraph of the transfer price (or commission) under section 994, an account receivable from the person with whom it engaged in the transaction equal to the difference in amount between the transfer price (or commission) so determined and the transfer price (or commission) previously paid and received. If, the account receivable due the DISC is paid within 90 days after the date it is established (or deemed established), then as of the end of the taxable year of the DISC in which the transaction occurred which gave rise to the indebtedness, the account receivable shall be treated as an asset, and, under § 1.993–2(d)(3) as a trade receivable, and thus as a qualified export asset.

**26.** *See* Gen.Couns.Mem. 39640 (Jan. 27, 1987) (Date Document Numbered—June 4, 1987); and Tech.Adv.Mem. 8720003 (Jan. 27, 1987).

**27.** Section 1.994–1(e)(4) provides:
  (4) Subsequent determination of transfer price or commission. The DISC and its related supplier would ordinarily determine under section 994 and this section the transfer price payable by the DISC (or the commission payable to the DISC) for a transaction before the DISC files its return for the taxable year of the transaction. After the DISC has filed its return, a redetermination of the transfer price (or commission) may only be made if permitted by the Code and the regulations thereunder. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations thereunder or section 861 and § 1.861–8 which affects the amounts which entered into the determination of the transfer price or commission.

after the date the receivables were established, plaintiff continues, the account receivable is to be treated as an asset and a trade receivable under Section 1.993–2(d)(3), and thus as a qualified export asset.

Plaintiff's argument fails to give effect to the interrelationship of provisions of Sections 1.993–2(d)(2) and 1.994–1(e)(3)(iii) with adjustments permitted by Section 1.994–1(e)(5). Plaintiff fails to take into account that there must be a payment of at least 50 percent of the ultimately determined commission in order to satisfy the provisions of Section 1.994–1(e)(3), and that 50 percent of the ultimate commission must be paid within 60 days of the close of the taxable year.

Plaintiff argues that the 60–day rule of Section 1.994–1(e)(3) is not involved in this case, and that SVCO met the 95 percent qualified export assets test. Plaintiff states this argument as follows:

> Rather, since SVCO's commissions were redetermined, Treas.Reg. § 1.994–1(e)(5) is applicable. On January 26, 1984, there was a redetermination of SVCO's commissions for its 1977 through 1981 taxable years, and SVCO filed amended Forms 1120–DISC reflecting this redetermination. On February 28, 1984, plaintiff paid the redetermined commissions to SVCO. Thus, the full amount of the redetermined commissions was paid to SVCO within 90 days after the redetermination date. Pursuant to Treas.Reg. § 1.994–1(e)(5), SVCO had qualified export receivables in the amount of the redetermined commissions for each year in question. Thus, for all the years at issue, as reflected on the amended returns, SVCO met the 95% qualified export assets test.

This argument isolates the amended returns and treats them as entirely unrelated to the original returns. This result is inconsistent with the policy of the DISC legislation to insure that tax deferred profits actually are used for export activities and are not diverted to production for the domestic market or for manufacturing overseas.

Plaintiff also contends it met the "safe harbor" test of Section 1.994–1(e)(3)(iv)(a) because: (1) it reported zero taxable income in its initial tax returns, (2) no commission receivables were created, and (3) the zero payments by plaintiff on the initial returns was reasonable. Plaintiff argues that when a corporation has not recorded any DISC income on its books and reports zero DISC income on its original return, it meets the safe harbor test because zero is 100 percent of zero. Plaintiff limits the term "tax return for the taxable year" referred to in Section 1.994–1(e)(3)(iv) to include only the initial returns, and to exclude amended returns for the particular taxable year.

Plaintiff's analysis does not give content to the requirement that a reasonable estimate of the commission payment which is claimed as a deduction is to be paid within 60 days following the close of the taxable year of the DISC. If the 50 percent safe harbor test were restricted to the amount of income that the DISC reported on its original return, an initial underreporting of its commission income because of omitted sales, automatically would circumvent the 60–day rule. In any subsequent amendment of the return to report additional commissions, under plaintiff's analysis of the 50 percent safe harbor test, no matter how long the amendment was delayed, additional commissions in the amended return would not be subject to the 60–day rule.

■ Determination of whether a reasonable estimate of the commission has been paid within 60 days of the close of SVCO's taxable year is not dependent on whether the commission income is reported on an original or on an amended return. The 50 percent safe harbor test intends that the commission amount paid within 60 days of the close of a DISC's taxable year equals at least 50 percent of the amount of the commission income reported ultimately by the DISC.

Plaintiff presented additional arguments in support of its contention that SVCO was a qualified DISC, including a contention that it met the gross receipts test. These additional arguments have been considered, but extended discussion of those issues is not necessary.

For the foregoing reasons, plaintiff's motion for partial summary judgment on the claims in Count I of the complaint must be denied, and defendant's cross-motion for partial summary judgment on those claims must be allowed.

---

On October 22, 1990, at a time after plaintiff's motion for partial summary judgment had been denied after oral argument, and after the foregoing opinion on Count I had been completed, plaintiff filed a document captioned: "Plaintiff's Second Motion for Partial Summary Judgment on DISC Issue and Plaintiff's Brief in Support of its Second Motion for Partial Summary Judgment on DISC Issue." Defendant filed a response on October 23, 1990.

Plaintiff's second motion for partial summary judgment states:

... If, based on Defendant's Cross–Motion, the Court rules that SVCO was not a DISC during its 1977 through 1982 taxable years (which Plaintiff vigorously opposes), Plaintiff respectfully requests the Court to grant it summary judgment that (i) SVCO was the proper person to be taxed on the commission income it reported on its amended returns for its 1977 through 1982 taxable years to the extent that it could properly have reported that income under section 994 had it qualified as a DISC and therefore (ii) Plaintiff is entitled to the corresponding deductions that it could have deducted in its 1978 through 1982 taxable years if SVCO had qualified as a DISC for the same period.

■■■ The concept of orderly procedure embraced by the legal department at the Quaker Oats Company is wonderously innovative. Notwithstanding its previous arguments that SVCO was a DISC at all times, SVC now claims it is entitled to the deductions at issue regardless of whether SVCO is to be treated as a DISC. Plaintiff's arguments cannot be raised at this late stage.

According to its tax returns, SVCO was completely inactive during the years in suit. All of the income earned was attributable to activities of SVC, not to SVCO. IRC § 482 requires that the commission deduction claimed be disallowed so as to clearly reflect income.[28]

■■■ SVC's new position also is inconsistent with the DISC statutory scheme. This new position is that SVC is entitled to the DISC deferral benefits even though SVCO was not a DISC during the years in suit. This result is not the objective of legislation that allows the benefit of deferral only to those taxpayers who meet explicit statutory requirements.[29]

On the basis of the foregoing, SVCO was not the proper person to be taxed on the commission income reported on its first amended returns. Plaintiff's second motion for partial summary judgment on the DISC issue must be DENIED.

## COUNT II

In Count II, SVC states it is entitled to tax refunds that result from deductions that were taken, pursuant to IRC § 162, for payments made in taxable years 1981 and 1982 to certain shareholders to redeem SVC common stock. The complaint stated the payments were made to protect, preserve and maintain SVC's existing goodwill and business, and to assure the normal continuation of its business. In the alternative, the complaint claimed, SVC was entitled, pursuant to IRC § 167(a), to amortize over a 5–year period the 1981 payment that had been made to certain shareholders.

In its motion for partial summary judgment on the claims in Count II, defendant relied upon facts alleged in the complaint, and sought summary judgment on both the business expense claim under IRC § 162(a), and on the alternative claim for amortization under IRC § 167(a). Plaintiff's cross-motion sought summary judgment with respect to its deduction as a business expense of (1) the full amount of the payments

**28.** *E.I. DuPont De Nemours & Co. v. United States,* 608 F.2d 445, 221 Ct.Cl. 333 (1979).

**29.** *See Gehl Co. v. Commissioner,* 795 F.2d 1324.

made to its shareholders for stock, or, (2) that portion of such payments which represents a premium paid. Plaintiff relied upon facts in the complaint, on defendant's proposed findings of uncontroverted facts, as well as upon its proposed additional findings of uncontroverted facts that were based upon affidavits of individuals who were members of SVC's senior management during the years in issue: Messrs. William B. Stokely III (president, and chief operations officer, or, chairman of the board and chief executive officer), Leonard J. Delehanty (vice chairman of the board and chief administrative officer), and K.M. Eberts, Jr. (chief financial officer).

Facts

During the 1970's and early 1980's, the book value of plaintiff's stock substantially exceeded its market selling price. In an effort to provide for future growth, and to maximize the value of plaintiff's stock, SVC adopted a long term corporate policy for redeployment of its assets. Under this policy, SVC would (a) dispose of assets and operations which generated low returns, such as unprofitable plants and product lines, and (b) invest the proceeds from such dispositions in profitable aspects of its business, and in new acquisitions.

SVC's redeployment of assets program was in progress in taxable years 1981 and 1982. Redeployment of assets involved substantial alterations in SVC's operations, including the sale of product lines related to seasonally produced canned fruits and vegetables, which had been the cornerstone of plaintiff's business. During 1981 and 1982, plaintiff had sold, or was in the process of selling substantial assets, and had realized, or was in the process of realizing, significant amounts of cash that had not been reinvested or committed to reinvestment.

During 1978 and 1979, GDV, Inc. (GDV), a subsidiary of City Investing Company (City) purchased more than 5 percent of plaintiff's outstanding common stock. By letter dated May 2, 1979, GDV and City filed with the federal Securities and Exchange Commission (SEC) a Schedule 13D to give notice of the acquisition of the SVC

stock. The notice included the following statements:

GDV currently owns 168,400 shares of Common Stock, constituting approximately 4.9% of the outstanding voting securities of Stokely. GDV in good faith intends to acquire from time to time such number of additional shares of Common Stock that will, together with the shares of Common Stock currently owned by it, result in the ownership by GDV of in excess of 15% and $15 million and as much as approximately 20% of the outstanding voting securities of Stokely. The exact number of shares to be acquired by GDV and the time of acquisition thereof are subject to market conditions.

\* \* \* \* \* \*

The purpose of the purchase of the 168,400 shares of Common Stock acquired as described in Schedule I hereto and the proposed purchase of additional shares of Common Stock as described in Item 1 is to provide GDV with an investment in the Company. The acquisition of such additional shares and the time of acquisition thereof are subject to market conditions.

While neither GDV nor City currently intends to seek representation on the Board of Directors of the Company or otherwise to seek to exercise control over the Company, they may, depending on circumstances existing in the future, seek to acquire sufficient additional shares of Common Stock so that they can exercise control over the Company.

In connection with GDV's acquisition of plaintiff's common stock and its SEC filing (a) the Securities Commissioner of the State of Indiana instituted administrative proceedings and legal proceedings in the Indiana State Courts against GDV and City, in which plaintiff intervened, (b) GDV and City instituted legal proceedings against officials of the State of Indiana in the Indiana Federal District and State Courts and in the 7th Circuit Court of Appeals, in which plaintiff intervened, and (c) plaintiff instituted legal proceedings against GDV and City in the Indiana Feder-

al District Court. Decisions rendered in the proceedings instituted by GDV and City are reported: *City Investing Co., G.D.V., Inc. v. Simcox,* 476 F.Supp. 112 (S.D.Ind.1979), and 633 F.2d 56 (7th Cir. 1980), and *In Re City Investing Co. v. Coons,* 411 N.E.2d 420 (Ind.Ct.App.1980).

The acquisition of SVC's common stock, and the GDV/City SEC filing, was of concern to SVC's senior management, and the administrative and legal proceedings resulted in an expenditure of substantial amounts of time, financial resources and effort by SVC's senior executives, and legal and other personnel. SVC's senior management believed that GDV's and City's acquisition activities, and the publicity about related administrative and legal proceedings, created an atmosphere that had an adverse effect upon the morale, recruitment and retention of plaintiff's personnel.

On April 28, 1981, SVC entered into an agreement with GDV and City under which plaintiff paid $5,338,200 to GDV and generally released GDV and City from all liabilities resulting from their purchase of 172,200 shares of SVC's stock; GDV and City agreed that (a) GDV would surrender plaintiff's common stock to plaintiff, (b) GDV and City would terminate all outstanding litigation, and (c) GDV and City would not acquire any stock, evidence of indebtedness or other security of plaintiff for 5 years (standstill covenant). The Agreement included the following premise:

WHEREAS, Stokely, desires to purchase from GDV and GDV desires to sell to Stokely the Purchase Shares upon the terms and for the consideration set forth herein, *including settlement of the Actions among the parties hereto and City's and GDV's covenant not to acquire, directly or indirectly, any interest in securities of Stokely on or prior to the fifth anniversary of this Agreement;* [emphasis in the original]

With respect to the standstill covenant by GDV and City, the Agreement states:

GDV and City covenant and agree that neither GDV nor City nor any of their respective subsidiaries or agents, nor, to the extent of their control, any of their respective parent companies, affiliates or controlling persons shall hereafter purchase or otherwise acquire, either beneficially or of record, directly or indirectly, either individually or jointly with, or through, one another or any other corporation, partnership, syndicate, venture, trust, estate or other person, any share or shares of the capital stock of Stokely or any evidence of indebtedness or any other security of Stokely, or enter into any contract, agreement or understanding, written or verbal, with any other person regarding such acquisition of the capital stock of Stokely or any evidence of indebtedness or other security of Stokely at any time on or *prior to the fifth anniversary hereof,* provided, however, *that The Home Insurance Company, a subsidiary of City, shall be free to acquire shares of capital stock or indebtedness of Stokely in the normal course of investing funds for its portfolio.* [emphasis in the original]

The 5–year standstill agreement was a mandatory and necessary condition of SVC's agreement. No monetary amount was allocated specifically to the standstill covenant.

On April 28, 1981, plaintiff's common stock traded at a high of $28.50 per share and a low of $28.25 per share. Based on an average trading price of $28.375 per share, plaintiff states it paid a premium of at least $452,025 above the market value of its stock. Based on information in plaintiff's SEC Form 10K for fiscal year ending May 31, 1981, defendant calculates the book value of SVC's stock, as of May 31, 1981, was equal to $42.32 per share of common stock outstanding.

By May 1982, Central National Corporation (CNC) and certain other persons acting in concert with CNC (together, the CNC Group) had purchased 296,000 shares, or approximately 9 percent, of plaintiff's outstanding common stock. Glickenhaus & Co. (Glickenhaus), a limited partnership, acting individually and on behalf of the owners of certain of its discretionary accounts, had purchased 157,500 shares or

approximately 5 percent of plaintiff's outstanding common stock. The CNC Group and Glickenhaus were acting in concert with respect to their acquisition of plaintiff's common stock.

On June 17, 1980, the CNC Group filed with the SEC a Schedule 13D to give notice of the acquisitions as of May 2, 1980, of SVC common stock. Item 4 of the notice, purpose of the transaction, included:

The purpose of the purchases of Common Stock by each of the persons filing this statement is to invest in Stokely. The persons filing this statement intend to continuously review their investment in Stokely and may, depending upon various factors, including general economic conditions, monetary and stock market conditions, regulatory conditions and future developments affecting Stokely, acquire additional shares of Common Stock in open market or private transactions or may sell any or all of the shares of Common Stock now owned or hereinafter acquired by them.

On May 10, 1982, Glickenhaus filed with the SEC a Schedule 13D to give notice of the acquisitions as of May 5, 1982, of SVC common stock. The statement on the purpose of the transaction included:

The Company has purchased the shares of Common Stock referred to in Item 5(a) hereof for investment purposes. The Company intends continuously to review its and its clients' investments in Stokely and may, depending upon various factors, including general economic conditions, monetary and stock market conditions, actions taken or policies adopted by Stokely's management, regulatory conditions and future developments affecting Stokely, acquire additional shares of Common Stock in open market or private transactions or may sell any or all of the shares of Common Stock now owned or hereinafter acquired by it. See Item 6 hereof.

In Item 6, the Schedule 13D reported the following relationship:

Representatives of the Company have had discussions with representatives of Central National Corporation, Gottesman & Company, Inc. and other persons filing a joint statement on Schedule 13D in respect of their shares of Common Stock (collectively, "Central National/Gottesman") concerning their respective investments in Stokely. The Company may, from time to time, act in concert with Central National/Gottesman in connection with the possible sale of their respective shares of Common Stock to one or more persons. The Company and Central National/Gottesman have contacted two potential purchasers and may contact others depending upon circumstances.

SVC's redeployment of assets program had not been completed in May 1982, and most of the cash realized, or about to be realized, from the disposition of the low return assets had not been reinvested. SVC's senior management believed that SVC was susceptible to an acquisition by persons who could acquire plaintiff with the intent to break up the company, sell off its parts and use the cash generated by such dispositions for their own purposes. SVC's senior management viewed the acquisition actions of the CNC Group and Glickenhaus as a threat to the continuation of the redeployment of assets program and believed that such actions jeopardized plaintiff's assets and business operations.

On May 11, 1982, plaintiff entered into agreements with (a) the CNC Group under which plaintiff purchased the CNC Group's 296,000 shares of plaintiff's common stock for $10,656,000, and (b) Glickenhaus, under which plaintiff purchased 157,500 shares of plaintiff's common stock owned by Glickenhaus for $5,670,000. The payments were made on May 18, 1982.

On May 11, 1982, plaintiff's common stock traded at a high of $33.375 per share and a low of $31.875 per share. Based on an average trading price of $32.575 per share, plaintiff states the CNC Group was paid a premium of at least $999,000 above the market value of its stock, and Glickenhaus was paid a premium of at least $531,562 above the market value. Based on information in plaintiff's SEC Form 10K for fiscal year ending May 31, 1982, defen-

dant calculates the book value of SVC's stock as of May 31, 1982, was equal to $46.12 per share of common stock outstanding.

Information in the SEC Form 10Ks filed by plaintiff indicates SVC's redeployment of assets program and SVC's normal operations in the 4–year period prior to its merger with Quaker Oats Company on July 18, 1983, were not seriously interrupted or interfered with by the acquisitions of SVC stock by GDV/City. The Form 10K information does not show that the acquisitions by CNC Group/Glickenhaus constituted such dire and threatening circumstances that SVC's continued existence was jeopardized.

In its discussions of fiscal 1980 compared to fiscal 1979, and fiscal 1979 compared to fiscal 1978, SVC's management stated the company's surplus cash positions at certain times during the year were due to the seasonal nature of a portion of its operations, as well as a result of strategy calling for reinvestment of a significant portion of its capital. In August 1979, SVC completed acquisition of Armstrong Chemical Co., Jamesville, Wisconsin, and as of May 31, 1980, merged it into SVC. In December 1979, SVC acquired the assets of Theobald Industries, Inc., Kearney, New Jersey.

In the SEC Form 10K for fiscal year ending May 31, 1981, SVC's management noted that during the past 3 years, SVC had redeployed a substantial portion of its capital out of the areas of its business where conditions did not allow an adequate return into areas where "it is believed there is a good opportunity for a better return" on its assets. This redeployment resulted in a reduction of working capital and an increase in fixed assets utilized in nonseasonable canning and vegetable oil operations. SVC's management stated the alternative of not changing the direction of the company's business "would have put it in an unfavorable financial situation today." In the comparison of fiscal 1981 to fiscal 1980, SVC reported that the $9 million of net earnings had declined 21 percent, and that the $565 million of net sales had increased 4 percent. Pretax gains rec-ognized on the planned disposition of fixed assets were approximately $4.5 million in 1980, compared to $1 million in 1981.

The SEC Form 10K for fiscal year ending May 31, 1982, reported that SVC's redeployment of assets program has resulted in a reduction of seasonal food processing activities and a greater emphasis on products that can be produced on a year round basis. SVC's management analysis included:

This shift in emphasis has allowed the Company to substantially increase its investment in fixed assets devoted to improved nonseasonal canning and vegetable oil operations, purchase a significant number of shares of its Common Stock, and reduce its long-term debt. These expenditures of capital have been funded primarily from cash flow provided by operations and reduced working capital without increasing debt.

In the comparison of fiscal 1982 to fiscal 1982, SVC reported the $15.2 million in net earnings represented a 68 percent increase, and that the $591 million in net sales represented an increase of 5 percent over 1981.

The SEC Form 10K for fiscal year ended May 31, 1983, covered the period June 1, 1982, through May 31, 1983. The Form 10K reported that SVC's program to restructure its business had continued through the 1983 fiscal year. SVC's management recapitulated that (a) in October 1982, SVC had sold substantially all of the assets and related business of its domestic frozen food operations, (b) in February 1983, SVC had announced the Grocery Product Group would discontinue processing and distributing seasonally produced canned fruits and vegetables, and (c) that additional processing plants and inventory had been sold subsequent to the close of the 1983 fiscal year.

In the comparison of fiscal 1983 to fiscal 1982, SVC noted that the $15.3 million net earnings in 1983 exceeded those of 1982, and that the $525 million in net sales were less than the $591 million in 1982.

The following table presents selected financial data for SVC and subsidiaries as reported on SEC Forms 10K:

| Dollars in Thousands, Except For Share Amounts | Year Ended May 31 | | | |
|---|---|---|---|---|
| | 1980 | 1981 | 1982 | 1983 |
| Net Sales | $541,528 | $564,957 | $591,071 | $525,214 |
| Net Earnings | 11,431 | 9,031 | 15,156 | 15,266 |
| Property Additions, Net | 16,573 | 15,858 | 22,695 | 10,872 |
| **Per share of Common Stock** | | | | |
| Net Earnings | 3.23 | 2.51 | 4.59 | 5.29 |
| Cash Dividends | 1.48 | 1.48 | 1.53 | 1.26 |
| Book Value | 39.93 | 41.46 | 45.84 | 49.41 |

The following table presents information concerning the price per share of SVC's common stock, as reported on SEC Forms 10K:

| Fiscal Period | | High* | Low* |
|---|---|---|---|
| 1980 | | 36¾ | 18 |
| 1981 | | 28½ | 19⅝ |
| 1982 | | | |
| | First Quarter | 29⅝ | 24 |
| | Second Quarter | 35½ | 25½ |
| | Third Quarter | 35 | 28½ |
| | Fourth Quarter | 34¼ | 25½ |
| 1983 | | | |
| | First Quarter | 31½ | 27½ |
| | Second Quarter | 48 | 29¾ |
| | Third Quarter | 57¾ | 45½ |
| | Fourth Quarter | 60 | 53¾ |

* NYSE Composite Transactions Sales Prices Per Share.

On July 18, 1983, SVC announced its approval of the proposal by the Quaker Oats Company to acquire all of SVC's outstanding common stock at $77 in cash per share.

## DISPOSITION

In its original federal income tax returns for taxable years ending May 31, 1981, and May 31, 1982, SVC's senior management did not claim any deductions for the amounts paid to GDV, CNC Group or Glickenhaus. Nor were any deductions claimed when the 1984 Amendments were submitted after Quaker Oats had acquired SVC. After further consideration, however, the Quaker Oats tax department had SVC, in the 1986 Amendments, take deductions for the full amount of the payments to GDV ($5,338,200), to the CNC Group ($10,656,000), and to Glickenhaus ($5,670,000). As a result of the deduction taken with respect to GDV, the refund claim amounted to $2,455,572 for the taxable year ending May 31, 1981. With respect to its payments to CNC Group and Glickenhaus, the refund claim for taxable year ending May 31, 1982, totaled $5,894,950.

Plaintiff's cross-motion for summary judgment on the Count II issues utilized affidavits of SVC's senior management officials, and exhibits referenced in the affidavits, to establish the factual background of the stock redemptions. These affidavits, prepared in June and July 1989, relate to transactions that occurred in 1981 and 1982 and were made by individuals who, after

the 1983 merger with Quaker Oats, no longer were responsible for SVC's operations and whose familiarity with those operations decreased.

Summary judgment is properly granted only when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law.[30] In cross-motions for summary judgment, each party is both a movant and an opposing party. A moving party bears the burden, as to the motion, of establishing the absence of any genuine issues as to any material facts. This does not mean that the burden is on the movant to produce evidence showing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof.[31] In cross-motions for summary judgment, each party's motion is evaluated on its own merits.[32] All significant doubt over factual issues are to be resolved against the moving party.[33]

The summary judgment procedure serves judicial economy, it saves the time and expense of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not be reasonably be expected to change the result.[34]

A material fact is one which will make a difference in the result of a case.[35] The substantive law identifies the facts that are material. The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[36]

Plaintiff asserts that the affidavits by SVC's senior executive managers establish that the stock redemption payments were necessary to remove conditions that threatened SVC's assets and business operations, and to save SVC from dire and threatening consequences which jeopardized its continued existence. The circumstances that the senior executives believed an unfriendly takeover would cause such conditions to exist, and that such belief was the basis for the decision to make the payments, does not establish that the business of SVC in fact was interfered with or that its continued existence was in jeopardy. Defendant does not dispute the allegations in the complaint relating to the purposes of the redemptions, and the belief of SVC's senior executives is not a fact material to the tax issue involved.

SVC's business operations, and its financial condition at the times the payments were made, are material facts that are established objectively by the exhibits incorporated in the record by both parties. There is no dispute as to the material facts and disposition of the claims in Count II by summary judgment is appropriate.

In its summary judgment motion, defendant argues that IRC § 311(a) prohibits any deduction for the amounts SVC paid to GDV, CNC or Glickenhaus to redeem its stock. Plaintiff contends that IRC § 311(a) applies only to a loss and therefore is inapplicable to ordinary and necessary business expenses that are authorized under IRC § 162(a). Alternatively, SVC contends that even if IRC § 311(a) applies to the portion equal to the market value of the SVC stock, it does not apply to the portion of the

---

30. RUSCC 56.

31. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. Kress*, 398 U.S. 144, 161, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142 (1970).

32. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

33. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Housing Corp. of America v. United States*, 468 F.2d 922, 924, 199 Ct.Cl. 705 (1972).

34. *Pure Gold, Inc. v. Syntec (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984); *U.S. Steel Corp. v. Vasco Metals Corp.*, 394 F.2d 1009, 1011, 55 C.C.P.A. 1141 (1968).

35. *See Curtis v. United States*, 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959).

36. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

payment which represents a premium over the market value of the stock, because the premiums represent separate taxable transactions under IRC § 162(a) as business expense deductions.[37]

IRC § 311(a) provides as follows:

*General Rule.*—Except as provided in subsections (b), (c) and (d) of this section and section 453B, no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of—

(1) its stock (or right to acquire its stock), or

(2) property.

The term "property" is defined in IRC § 317 to include "money" and stock is redeemed "if the corporation acquires its stock from a shareholder in exchange for property ..."[38]

The term "distribution with respect to stock" is defined by the IRS to include "distributions made in redemption of stock."[39]

▆▆▆▆ The exceptions to the general rule set forth in IRC § 311(a) do not apply to the facts of this case. IRC § 311(a), however, does apply to the facts in SVC's claim, and no deduction under IRC § 162

for amounts paid to SVC shareholders to redeem its stock is permissible. That the payments may have been made to the respective shareholders for legitimate business purposes to protect, preserve or maintain SVC's business is irrelevant under IRC § 311(a). Payments made to shareholders to redeem stock represent a capital transaction and are not deductible as a matter of law.

Plaintiff agrees that IRC § 311(a) applies to a normal stock redemption. It is plaintiff's position, however, that Section 311(a) does not apply to a stock repurchase payment where the payment meets the deductibility standards of IRC § 162(a). The narrow issue is whether IRC § 311(a), in explicitly providing for nonrecognition of a loss, implicitly precludes a deduction for plaintiff's payments to redeem its stock.

IRC § 311 initially was passed as part of the Internal Revenue Code of 1954. It then stated that "no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of ... property." Prior to 1969, a corporation ordinarily could redeem its stock with appreciated property and escape recognition of

---

37. On its amended returns, SVC claimed it was entitled to a deduction either under IRC § 162 or IRC § 165 (allowing a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise). Defendant challenged plaintiff's deduction under both Code sections. In its argument, SVC has focused only on IRC § 162 concepts.

38. IRC § 317 states:

(a) Property
For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).
(b) Redemption of stock
For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

39. Treas.Reg. § 1.311–1(a) provides:

Except as provided in subsections (b), (c), and (d) of section 311, section 453(d) (relating to installment obligations) and such other provisions of the Code as sections 341(f),

617(d), 1245(a), 1250(a), 1251(c), and 1252(a), no gain or loss is recognized to a corporation on the distribution, with respect to its stock, of stock, or rights to acquire its stock, or property (regardless of the fact that such property may have appreciated or depreciated in value since its acquisition by the corporation). However, the proceeds of the sale of property in form made by a shareholder receiving such property in kind from the corporation may be imputed to the corporation if, in substance the corporation made the sale. Moreover, where property is distributed by a corporation, which distribution is in effect an anticipatory assignment of income, such income may be taxable to the corporation. The term "distributions with respect to its stock" includes distributions made in redemption of stock (other than distributions in complete or partial liquidations). See, however, paragraph (e) of this section for distributions to which section 311 does not apply. For the rule respecting the taxation of a corporation making a distribution of property in partial or complete liquidation, see section 336.

Section 311 was initially passed as part of the Internal Revenue Code of 1954. The definition cited in Treas.Reg. § 1.311–1(a) was promulgated in T.D. 6152, 1955–2 C.B. 61, 97, which was filed on Dec. 2, 1955.

any gain. Although no hearings were held on the matter, and there was no Treasury proposal to this effect, IRC § 311 was amended by the Tax Reform Act of 1969 by addition of Section 311(d).[40] The amendment provided that, when a corporation redeems its stock with property that had appreciated in value, income was to be recognized to the corporation. If the nonrecognition provisions of Section 311(a) do not apply when a corporation redeems its own stock, then no purpose was served by adding Section 311(d).

Plaintiff argues that IRC § 311(a) applies only to a gain or a "loss." A "loss" is different from an "expense" and therefore by its terms IRC § 311(a) also does not apply to an expense deduction under Section 162. Typically, a corporation's purchase of its own stock is a capital transaction, and no deduction is allowable for the purchase amount, or expenses associated with the purchase.

It is well established in the tax law that deductions for the cost of acquiring capital assets are precluded. The Supreme Court addressed this issue in two 1970 decisions.[41] The Court explained:

Since the inception of the present federal income tax in 1913, capital expenditures have not been deductible. See Internal Revenue Code of 1954, § 263. Such expenditures are added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the asset is sold. If an expense is capital, it cannot be deducted as "ordinary and necessary," either as a business expense under § 162 of the Code or as an expense of "management, conservation, or maintenance" under § 212. [Footnotes omitted.]

The stock purchased by SVC is a capital asset. Plaintiff cannot claim a deduction for the price paid to acquire its own stock, and therefore it must be claiming a loss, which is expressly disallowed by IRC § 311(a).

SVC would distinguish the two 1970 Supreme Court cases on the ground that they dealt with litigation expenses in connection with the purchase of stock which were claimed as deductions by the taxpayers. The general rule, however, is that a corporation in a normal stock redemption is not entitled to deduct amounts paid for the fair market value of its stock.

Plaintiff argues that it comes within a narrow exception to the general rule of capitalization that was recognized by the Fifth Circuit in *Five Star Mfg. Co. v. Commissioner*.[42] In *Five Star* the corporation consisted of two 50 percent shareholders, Kincade and Smith, who were exclusively licensed to manufacture, use and sell a patented heater under a patent owned by Freeman. Kincade and Smith transferred an exclusive 10–year license to manufacture to Five Star. Subsequently, Freeman sued for unpaid royalties and attached most of Five Star's assets. The patent holder, Freeman, obtained a judgment and cancellation of the patent licensing agreement which Freeman had given to the shareholders and which had been leased or assigned to Five Star. Freeman made a new agreement with Kincade and refused to enter any arrangement in which Smith was a participant as a stockholder or otherwise. In litigation instituted by Smith, seeking receivership for Five Star, a judgment was entered for Five Star against Smith for $56,715.43, and Kincade was given a judgment against Five Star for $296,-723.21. Five Star was not put into receivership because the only creditor of any consequence was Kincade (for salary claims).

**40.** Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487. *See* B. Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders*, ¶ 7.21, at 7–47 (3d 1971).

**41.** *Woodward v. Commissioner*, 397 U.S. 572, 574–75, 90 S.Ct. 1302, 1304, 25 L.Ed.2d 577 (1970); *United States v. Hilton Hotels Corp.*, 397 U.S. 580, 583, 90 S.Ct. 1307, 1309, 25 L.Ed.2d 585 (1970).

**42.** 355 F.2d 724 (5th Cir.1966).

Since the Five Star corporation had no working capital and no credit, Kincade borrowed the necessary funds, which were then advanced to the corporation so that Smith's stock could be bought out and his interest in the corporation could be terminated. Under these facts, the court allowed a business expense for the purchase price paid for the stock.

After the Supreme Court decided *Woodward* and *Hilton* in 1970, the Fifth Circuit limited *Five Star* to its facts.[43] A similar analysis has been used by the Third Circuit[44] as well as the Tax Court[45] when a corporation redeems its stock. Section 311(a) is relied upon and deductions are denied. In *H & G Industries*, the taxpayer sought to deduct the premium (*i.e.*, the amount by which the price paid to redeem preferred stock exceeded the stock's par value) it paid to redeem preferred stock. The redemption of the preferred stock was deemed necessary by the corporation because the payments due on the stock reduced the corporation's working capital and limited the growth potential of the company.[46] The court noted that the stock redemption at issue was no more than astute business decision, and the deduction was disallowed. The court held that "[p]ermitting a § 162 business expense deduction in such a situation would completely undercut the specific prohibition of loss deductions under § 311."[47]

Plaintiff asserts *H & G Industries, Harder Services*[48], and *Proskauer* are irrelevant since none of them involve a deductible stock repurchase payment, that is, "a payment made to protect the corporation's ongoing and future existence." It is clear, however, that plaintiff has not established that SVC experienced the type of oppressive corporate circumstances found in *Five Star*, the case upon which it relies.

The financial condition and business operations of SVC, not the objective or reputation of GDV and City or CNC Group and Glickenhaus, as described by SVC, are determinant of the existence of "dire circumstances." Unlike the plaintiff in *Five Star*, SVC was a highly profitable corporation when it redeemed its stock. Plaintiff's taxable income (as initially reported on Form 1120, line 30) for the years in question was $15,243,789 (May 31, 1980); $10,393,191 (May 31, 1981); and $17,961,838 (May 31, 1982).

SVC argues that IRC § 311 is limited to distributions which are made by reason of the corporation-stockholder relationship, and states the IRS recognizes this limited application in the regulations.[49] Plaintiff contends that IRC § 311(a) cannot apply to a Section 162(a) deductible expense, since the payment is not made by reason of the corporation-stockholder relationship. Plaintiff's analysis fails to recognize that the regulation turns on the status of the other party to the transaction. GDV, CNC

---

43. See *Markham & Brown Inc. v. United States*, 648 F.2d 1043, 1046 (5th Cir.1981) (amount paid to redeem stock to eliminate a shareholder who disrupted the corporation's business held not to be deductible); *Jim Walter Corp. v. United States*, 498 F.2d 631, 639 (5th Cir.1974) (amount paid to shareholder to redeem stock in connection with corporate reorganization held not to be deductible).

44. *H & G Industries, Inc. v. Commissioner*, 495 F.2d 653 (3d Cir.1974), *aff'g*, 60 T.C. 163 (1973).

45. *Proskauer v. Commissioner*, 46 T.C.M. (CCH) 679 (1983) (amount paid to redeem stock to resolve conflict between two families concerning business operations held not deductible under section 162).

46. *H & G Industries, Inc. v. Commissioner*, 495 F.2d at 655.

47. *Id.* at 658.

48. *Harder Services v. Commissioner*, 67 T.C. 585 (1976), *aff'd*, 573 F.2d 1290 (2nd Cir.1977).

49. Treas.Reg. 1.311–1(e)(1) provides:

(e)(1) Section 311 is limited to distributions which are made by reason of the corporation-stockholder relationship. Section 311 does not apply to transactions between a corporation and a shareholder in his capacity as debtor, creditor, employee, or vendee, where the fact that such debtor, creditor, employee, or vendee is a shareholder is incidental to the transaction. Thus, if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property.

Group, and Glickenhaus did not stand in the capacity of debtors, creditors, employees, or vendors and in a relationship where the shareholding was incidental to the sale. GDV, CNC Group and Glickenhaus capacity as stockholders was the only reason that motivated SVC to enter the transaction.

The regulation has nothing to do with plaintiff's characterization of its payments for tax purposes. Subsection (e)(1) provides that "if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property." Hence, the corporation would not enjoy nonrecognition as it would under IRC § 311(a).

The Tax Reform Act of 1986 amended IRC § 162 to deal explicitly with expenditures incurred to repurchase stock from stockholders to prevent a hostile takeover.[50] Section 162(k) of the 1986 Code prohibits deductions otherwise allowable for payments paid or incurred to redeem its corporate stock.[51] Section 162(k) applies only to payments made after February 28, 1986. SVC contends that a prospective change of the tax law evidences that the tax deductions foreclosed by the change were allowable under prior law, and that, if IRC § 311(a) already prevented the deduction of such expenses, the addition of new Section 162(k) was superfluous. The legislative history refutes SVC's argument.

The House Committee on Ways and Means, in its analysis of present law noted:

The Supreme Court has held that the requirement that stock redemption expenses be capitalized extends not only to amounts representing consideration for the stock itself, but also to expenses such as legal, brokerage, and accounting fees incident to the acquisition. [citing *Woodward* and *Hilton Hotels.*][52]

The Section 162(k) amendment was stated to be for clarification. The report states:

### REASONS FOR CHANGE

The committee understands that some corporate taxpayers are taking the position that expenditures incurred to repurchase stock from stockholders to prevent a hostile takeover of the corporation by such shareholders—so-called "greenmail" payments—are deductible business expenses. The committee wishes to clarify that all expenditures by a corporation incurred in purchasing its own stock, whether representing direct consideration for the stock, a premium payment above the apparent stock value, or costs incident to the purchase, are nonamortizable capital expenditures.[53]

\* \* \* \* \* \*

In making this clarification, the committee does not intend to create any inference that the payments covered by this section would be deductible under present law.[54]

In conference, the provision was retained. The conferees provided that no inference

---

**50.** Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085.

**51.** Section 162(k) provides:
(k) Stock Redemption Expenses
  (1) In general
  Except as provided in paragraph (2), no deduction otherwise allowable shall be allowed under this chapter for any amount paid or incurred by a corporation in connection the redemption of its stock.
  (2) Exceptions
  Paragraph (1) shall not apply to—
  (A) Certain specific deductions
  Any—
  (i) deduction allowable under section 163 (relating to interest), or

  (ii) deduction for dividends paid (within the meaning of section 561).
  (B) Stock of certain regulated investment companies
  Any amount paid or incurred in connection with the redemption of any stock in a regulated investment company which issues only stock which is redeemable upon the demand of the shareholder.

**52.** H.R.Rep. No. 426, 99th Cong., 1st Sess., 248 (1985).

**53.** *Id.*

**54.** *Id.* at 249.

from the change as to present law was appropriate. The conferees stated:

> In denying a deduction for payments in connection with redemptions of stock, the conferees intend no inference regarding the deductibility of such payments under present law. Moreover, no inference is intended as to the character of such payments in the hands of the payee.[55]

If IRC § 311(a) applies, SVC would bifurcate the redemption payments into two transactions: (1) a section 311(a) nontaxable exchange of SVC's stock for the amount of the payment that is equal to the fair market value of such stock, and (2) a taxable exchange for the amount of the payment which exceeds the fair market value. Plaintiff argues that the second transaction is not subject to section 311(a) because it is not a distribution with respect to SVC's stock. The redemption "premium" is defined as the amount of the payments which exceeds the average open market trading price on the day of the transaction.

The question presented is whether the amounts plaintiff calls redemption premiums are costs incurred in the acquisition of capital assets, analogous to the expenses which the Supreme Court in *Woodward* and *Hilton Hotels* has stated are to be treated as capital expenditures. In *Woodward,* the Supreme Court rejected the "primary purpose" test to decide the tax treatment of acquisition costs. The Court observed "[a] test based upon the taxpayer's 'purpose' in undertaking or defending a particular piece of litigation would encourage resort to formalisms and artificial distinctions."[56] The Court found the proper standard should be based on the origin of the claim litigated. This standard comported with the ruling in *United States v. Gil-*

*more,*[57] in which the Court rejected a test that looked to the consequences of litigation and did not even consider the taxpayer's motives in undertaking a defense of the litigation.

The Court acknowledged the origin of the claim standard may present borderline cases "in which it is difficult to determine whether the origin of particular litigation lies in the process of acquisition."[58] SVC's claim is not a borderline case. SVC's premium payments were included in the price that was negotiated to establish the purchase price, and directly concerned the acquisition of stock. With respect to a purchase price, the Court approved as a fundamental consideration "wherever a capital asset is transferred to a new owner in exchange for value either agreed upon or determined by law to be a fair *quid pro quo*, the payment itself is a capital expenditure...."[59]

SVC paid a sum certain in exchange for its stock, a capital asset. There is no way to distinguish the alleged "premium" from the remainder of the purchase price. Under ordinary circumstances, the full amount of the purchase price becomes the taxpayer's basis in the capital asset acquired. Since plaintiff cannot claim a deduction for the price paid to purchase stock, it cannot claim a deduction for any amount it may have overpaid for the stock. In *Montana Power I*, the Court of Claims stated:

> If one buys something and pays more than it is worth, and more than he can resell it for, there are no immediate tax consequences of this every day occurrence. * * * He must "realize" his bad bargain, his loss, by selling. Likewise when he makes a good bargain and gets something worth more than he pays or

**55.** H.R.Conf.Rep. No. 841, 99th Cong.2d Sess., II 168–69 (1986).

**56.** *Woodward v. Commissioner*, 397 U.S. at 577, 90 S.Ct. at 1306.

**57.** 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963).

**58.** *Id.* In *El Paso v. United States*, 694 F.2d 703, 711 (Fed.Cir.1982), the court noted that the origin of the claim test was not applicable to cer-

tain expenses in the case at hand. On the facts, the "origin" of the transaction was previous rulings of the Supreme Court, and disposal of the property was secondary and far down the line from such origin.

**59.** *Woodward v. Commissioner*, 397 U.S. at 579 n. 8, 90 S.Ct. at 1307 n. 8.

promises to pay for it, he is not taxed upon his good fortune until he realizes his gain by selling.[60]

In *Harder Services*, the Tax Court denied a deduction for an amount paid to a stockholder to terminate his employment with the company where that amount could not be separated from the price paid to redeem his stock in the company.[61] The fact that SVC may have had a dual motive in redeeming its stock does not necessarily indicate that it paid a "premium" for any asset other than the stock redeemed. Since purchase of stock was central to the 1981 and 1982 redemptions, there can be no recognizable "premium" in the total price SVC paid to secure the stock.

SVC argues that the *Five Star* decision does not apply to the "premium" paid to redeem its stock, and that the "premium" is deductible even if Stokely was a solvent, profitable company in 1981 and 1982. This argument has been rejected by the Fourth Circuit in a case that holds the amount paid by a railroad in excess of the face value of its stock was not deductible.[62] The taxpayer argued that this amount was deductible because "the repurchases facilitated its business by removing restrictions on the transferability of corporate property." The Court stated, "[i]f a repurchase premium can ever be deducted upon that theory * * * there must be a showing of dire necessity." [63]

Plaintiff's alternative argument in Count II of the complaint is that if it is denied a deduction under IRC § 162(a) for its payment to GDV, it is entitled to amortize the payment over a 5–year period under IRC § 167(a). SVC says the payment to GDV was made in exchange for GDV's and City's standstill agreement not to acquire any stock in plaintiff for 5 years. Since the full amount paid to GDV was allocated in plaintiff's amendment for the refund, an allocation of any amount up to the full amount is properly before the court.

▇▇▇▇▇▇ An amortization deduction is available for an intangible asset if its useful life is definite; it is not if the property's useful life is indeterminate or indefinite. Defendant contends since plaintiff's refund claim made no allocation of the GDV payment between the price of the stock and the standstill agreement, SVC is foreclosed from doing so in this case in order to obtain a deduction under IRC § 167(a).

Defendant is correct. "The protection of the revenue authorizes the Commissioner to demand information in a particular form, and he is entitled to insist that the form be observed so as to advise him expeditiously and accurately of the true nature of the claim." [64] Plaintiff cannot ask the court to do what it has not done for itself. The court is in no position to allocate a portion of the payment to the standstill agreement.

Plaintiff states that since the entire agreement was premised on the standstill agreement, it is obvious that the payment made to GDV was intended as payment, *in part*, for the standstill agreement. SVC states that since the agreement was a necessary condition of the purchase, the entire payment therefore may be amortized. SVC asserts that, whether the origin of the claim standard or the primary purpose test is used, the result is the same in that its stock acquisition was a secondary consequence of pursuing a valid business action. It stretches credibility to imagine that SVC

**60.** *Montana Power Co. v. United States*, 159 F.Supp. 593, 595, 141 Ct.Cl. 620, *cert. denied*, 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed.2d 76 (1958) (*Montana Power I*) (the Court of Claims held that the difference between the amount paid to redeem debentures and the basis of the assets acquired with the debentures was not deductible in the year of the redemption).

**61.** *Harder Services v. Commissioner*, 67 T.C. at 597–98; *see also Southern Natural Gas Co. v. United States*, 412 F.2d 1222, 1237, 188 Ct.Cl. 302 (1969).

**62.** *Richmond, Fredericksburg & Potomac Railroad v. Commissioner*, 528 F.2d 917 (4th Cir. 1975).

**63.** *Id.* at 920; *see also H & G Industries, Inc. v. Commissioner*, 495 F.2d at 657 (deduction for premium denied because the redemption was not necessary for the survival of the corporation).

**64.** *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 299, 65 S.Ct. 1162, 1165, 89 L.Ed. 1619 (1945).

would have paid this amount just for the standstill agreement, without GDV and City surrendering the stock. In this case the surrender of stock is so closely related to the agreement that the payment to GDV is required to be considered a nonamortizable capital expenditure.

On the basis of the foregoing, plaintiff's motion for partial summary judgment on the claims in Count II must be denied. Defendant's cross-motion for partial summary judgment must be allowed.

## CONCLUSION

On the basis of the facts applicable to plaintiff's claims in Counts I and II of the complaint, defendant is entitled to judgment as a matter of law. The Clerk is directed to dismiss the complaint. Defendant may recover its costs.